Christopher **HUFFMAN** and Patrick **Huffman, Appellants, (Plaintiffs Below),**

v.

**MONROE COUNTY COMMUNITY SCHOOL CORPORATION, Appellee, (Defendant Below).**

No. 60S01–9203–CV–180.

Supreme Court of Indiana.

March 19, 1992.

◎~25

Jay D. Allen, Allen, Allen & Allen, Salem, for appellants.

Gary J. Clendening, J. Suzette Vandivier, Harrell, Clendening & Coyne, Bloomington, for appellee.

## ON PETITION TO TRANSFER

KRAHULIK, Justice.

Plaintiffs–Appellants, Christopher Huffman and Patrick Huffman, seek transfer after the Court of Appeals affirmed the trial court's entry of summary judgment in favor of Appellee–Defendant, Monroe County Community School Corporation (hereinafter "MCCSC") in the Plaintiffs' suit to recover damages for personal injuries sustained during a high school track meet that took place at an MCCSC facility. The question to be examined is whether the "release rule" should operate to remove the MCCSC from the litigation.

The facts necessary to our discussion of this question follow. On May 27, 1986, Bloomington North High School, part of the MCCSC, was hosting a track meet. Tell City High School, a part of the Tell City–Troy Township School Corporation (hereinafter "TCTTSC") was participating at this meet. The competition was sponsored by the Indiana High School Athletic Association, Inc. (hereinafter "IHSAA"). Plaintiff, Christopher Huffman, a student at Salem High School, was participating in the meet.

During a warmup period, a member of the Tell City track team threw a shot put, striking Christopher in the back of the head, knocking him unconscious. Christopher sustained a severe laceration to the head, leaving tenderness and a scar, and a shoulder fracture that required surgery. This injury is of a permanent nature, necessitating additional surgery.

Christopher and his father brought suit against the MCCSC, TCTTSC, and IHSAA alleging damages in the amount of $250,-000. In February of 1989 the Huffmans entered into a Covenant Not to Sue with TCTTSC, which was then dismissed from the suit. In January of 1990, the Huffmans executed a General Release in favor of IHSAA in exchange for $5,000. IHSAA was then dismissed from the suit.

The remaining Defendant, MCCSC, filed a motion for summary judgment arguing that the Huffmans' release of IHSAA served to release them from liability as a matter of law under this State's "release rule." The trial court granted this motion.

The Plaintiffs appealed, arguing that one of the effects of the enactment of the comparative fault statute in Indiana was to abrogate the common law rule regarding release of tortfeasors, even as to govern-

mental entities who are excluded from the act and remain governed by common law. The Court of Appeals agreed with this argument, but, nevertheless, constrained by Supreme Court precedent, affirmed the trial court's ruling. (1991) Ind.App., 564 N.E.2d 961, 965. We have been requested to examine the "release rule" in light of the legislative enactment of the Comparative Fault Act.

### The Release Rule

Indiana has traditionally adhered to the common law doctrine that release of one joint tortfeasor operates as a release of all other tortfeasors. The rule operated even in the face of express agreements between the parties that it should not prevent the victim from proceeding against other actors. *See Cooper v. Robert Hall Clothes, Inc.* (1979), 271 Ind. 63, 390 N.E.2d 155. The rule is based, in part, on the rationale that where a single injury is produced by the joint acts of several persons, such injury was produced by only a single entity and the act of each joint tortfeasor was considered to be the act of the entity. Thus, a release of one of the actors, even if the consideration received for the release did not result in actual satisfaction of the claim, was deemed a surrender of the right to proceed against the entity or any individual who was part of the entity. *See Bellew v. Byers* (1979), 272 Ind. 37, 396 N.E.2d 335, *quoting Robert Hall Clothes, Inc.* (1979), 271 Ind. 63, 390 N.E.2d 155. The rule was a product of equity designed to prevent unjust enrichment by not allowing a plaintiff to recover more than one hundred per cent of his total loss. *Id.* This Court has yet to examine whether the rationale supporting the release rule remains viable in light of Indiana's Comparative Fault Act.

### Application of the Release Rule Since Comparative Fault

 Prior to the enactment of Indiana's Comparative Fault Act, the release rule, with its supporting rationales, had come under attack by legal scholars. This attack is exemplified by the fact that both the *Restatement (Second) of Judg-*

*ments* § 50 (1982) and *Restatement (Second) of Torts* §§ 885, 886 (1979) rejected the release rule and replaced it with "the modern rule that releases or payments by one tortfeasor do not discharge others liable for the same harm, except to the extent that it is so agreed, but that payments do serve to diminish the claim against other tortfeasors to the extent of the payment made." 3 *Harper, Gray and James, The Law of Torts, Second Edition*, 37 (1986). Additionally, the Court of Appeals expressed its displeasure with the rule, while affirming the trial court's entry of summary judgment in the present case, by stating: "In any event, regardless of whether the release rule has ever constituted anything but an abomination in law, we must follow our supreme court's precedents of *Bellew, supra* and *Cooper, supra.*" 564 N.E.2d at 965.

The issue of whether the attack on the release rule prior to the Comparative Fault Act was justified, was rendered moot by the enactment of that Act. By prohibiting a verdict which compensates for more than one hundred per cent of the damages sustained by a claimant, the possibility of a plaintiff being unjustly enriched by receiving more than complete satisfaction for an injury has been eliminated. Additionally, the metaphysical common law concept of viewing all joint tortfeasors as a single entity has been superseded by the Act's requirement that the degree of fault of each tortfeasor be determined and compared to that of the plaintiff. Both of the underlying rationales for the release rule have been destroyed by the legislature's enactment of the Comparative Fault Act. Consequently, the much-criticized release rule should exist no longer in comparative fault cases.

MCCSC argues that regardless of the disposition of the rule in comparative fault cases, it should still be applied here because MCCSC, a governmental entity, is exempted from coverage under the Comparative Fault Act. It is logical, however, that the rule be deemed invalid as to non-comparative fault parties as well. The underlying rationale for the release rule has

been eroded by the development of the common law in Indiana. The development of covenants not to sue, covenants not to execute, and loan agreements can be traced directly to an attempt to circumvent the harshness of the "release rule" while promoting the judicial policy of encouraging partial settlements. *Manns v. State, Dept. of Highways* (1989), Ind., 541 N.E.2d 929. Our common law has reacted to these creative agreements by providing for their use in civil trials so as to prohibit excessive recoveries. As *Manns* makes clear, the trial court judge has the power and duty to reduce jury verdicts by amounts received in settlement, thus ensuring that a plaintiff will not receive more than a full recovery. The rationale for the release rule can no longer be found in our common law.

It would be illogical to hold that the rationales for the release rule have been destroyed but to continue to impose the release rule in some cases only because one of the defendants has been exempted from the Comparative Fault Act. To apply two separate rules based on the legal status of the parties would serve to add further confusion to the orderly administration of justice in cases, as here, where some parties are covered by the Comparative Fault Act and others are not. Although we cannot end all of the confusion created by this predicament in one case, we refuse to add to it by imposing two conflicting rules of law regarding the effect of a release. We, therefore, hold that the release rule is no longer the common law of this State.

■ Not only is the abrogation of the release rule the most sensible option, it also comports with the law in the vast majority of American jurisdictions. The position currently in force in most states is reflected in Section 885(1) of the *Restatement (Second) of Torts*. The *Restatement* provides that "a valid release of one tortfeasor from liability for harm, given by the injured person, does not discharge others liable for the same harm, unless it is agreed that it will discharge them." *Restatement (Second) of Torts*, § 885(1) (1979). The effect of this rule is to give life to the parties' intent. A release executed in exchange for proper consideration works to release only those parties to the agreement unless it is clear from the document that others are to be released as well. A release, as with any contract, should be interpreted according to the standard rules of contract law. Therefore, from this point forward, release documents shall be interpreted in the same manner as any other contract document, with the intention of the parties regarding the purpose of the document governing.

### Interpretation of The Release Agreement in This Case

■ The release document in this case cannot be said to be "clear and unambiguous" on its face. It is entitled "General Release." The first paragraph names only the IHSAA, its employees, agents, and assigns as the person being released from any and all claims, demands, damage actions, causes of action or suits of any kind. The second paragraph states that the terms of the settlement have been accepted "for the purpose of making a full and final compromise, adjustment and settlement of any and all claims, disputes, or otherwise, and for the express purpose of precluding forever any further or additional claims arising out of the aforesaid." These contradictory references cloud the intent of the document. Consequently, parol evidence may be utilized to determine the parties' true intentions respecting the document's application. *Thomas v. Thomas* (1991), Ind., 577 N.E.2d 216, 220; *Boswell v. Lyon* (1980), Ind.App., 401 N.E.2d 735, 740. This, of course, necessitates that the entry of summary judgment be reversed and the case remanded for such a factual determination.

### Conclusion

The reasoning supporting the existence of the release rule is no longer valid in light of the enactment of the Indiana Comparative Fault Act. Logic dictates that the abrogation of the release rule should extend to all defendants and not just to those covered by the Comparative Fault Act. From this point forward, a release shall be

interpreted as a contract releasing only those persons intended to be released. The agreement in this case did not clearly identify who was intended to be released by its provisions. Consequently, this case must be remanded to the trial court for a determination as to whether the parties to the release intended it to release MCCSC.

Transfer is granted, the Court of Appeals' opinion is vacated, the entry of summary judgment is reversed, and the case is remanded to the trial court.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.