**Irwin CHAIKEN and Ravinder Chopra, Appellants–Defendants,**

v.

**ELDON EMMOR & COMPANY, INC., Appellee–Plaintiff.**

No. 37A03–9102–CV–0032.

Court of Appeals of Indiana, Third District.

Aug. 10, 1992.

Wanda E. Jones, Terrence M. Rubino & Associates, Munster, William H. Tobin, Ruman, Clements & Tobin, Hammond, for appellants-defendants.

Jerry A. Huelat, Rowe, Foley & Huelat, South Bend, for appellee-plaintiff.

HOFFMAN, Judge.

Appellants-defendants Irwin Chaiken and Ravinder Chopra appeal a jury verdict which awarded appellee-plaintiff Eldon Emmor & Company, Inc. (Eldon) monetary damages in the sum of $18,675.00 and punitive damages in the sum of $80,000.00. Eldon presents a cross-appeal based upon the trial court's determination that Chaiken and Chopra should be allowed to setoff the

compensatory damages award due to Eldon's recovery from a non-party.

The evidence relevant to the appeal demonstrates that Eldon is a stock brokerage firm for which Chopra was employed as an account representative commencing in June 1980. Chaiken was a client of Eldon. Chaiken's account was ministered by Eldon's president and chief executive officer, Bill Bransky. In the latter portion of 1980, Bransky transferred Chaiken's account to Chopra to allow Chopra to build his clientele.

Pursuant to securities regulations, Eldon acted as an introducing firm. Eldon was required to utilize a correspondent broker to purchase stock. Also, Eldon was not allowed to hold stock certificates. Eldon forwarded its clients' certificates to the correspondent broker. In May 1981, Eldon changed to a different correspondent broker, Prudential–Bache (Bache). After the change, numerous errors occurred within Eldon's clients' accounts.

As Bransky became aware that errors were occurring, he and his former partner began working extended hours, seven days per week, in an attempt to identify the mistakes. Bransky also instructed the Eldon account representatives to check for errors. On October 1, 1981, Bransky hired Tom Dunleavy as controller. Dunleavy, who had been employed by the National Association of Security Dealers (NASD), began working 16 hours per day, seven days per week. Because mistakes continued to occur even after the initial conversion to Bache, the problem-solving task was further complicated.

In June 1981, 900 shares of National Semi–Conductor stock which had been purchased by an Eldon customer, Barry Barton, and Barton's mother, were mistakenly transferred into Chaiken's account. Chaiken had never purchased any Semi–Conductor stock.

Sometime between October and December 1981, Chopra discovered the mistake in Chaiken's account. Then, between January and April 1982, Chopra told Dunleavy that some of Chopra's customers had mistakenly received stock during the transfer. Chopra stated that because he considered the extra stock "goodies," he would not divulge the customers' names.

After reporting the discussion to Bransky, Dunleavy commenced a thorough search of Chopra's accounts which consumed approximately two to four weeks of Dunleavy's time. Bransky questioned Chopra about the errors. Chopra stated that he had no knowledge of mistaken transfers. When Dunleavy's intense investigation failed to reveal any errors, Dunleavy told Bransky that he believed the accounts were in order. Bransky concluded that Chopra's comments to Dunleavy were made in jest.

In May 1982, Chopra left Eldon to open his own brokerage firm. Chaiken transferred his account from Eldon to Chopra's firm. At the time the transfer was made, Chaiken's account contained only the 900 shares of Semi–Conductor which were mistakenly in his account and which were actually owned by the Bartons.

During a telephone conversation in June 1982, Chaiken informed Chopra that he wished to immediately sell the 900 shares of Semi–Conductor which he owned. Chaiken then met with Chopra in person. Chaiken gave Chopra an account statement listing Chaiken as the owner of the 900 shares of Semi–Conductor. Chopra prepared a transfer request which identified the stock to be transferred as the 900 shares of Semi–Conductor, allegedly owned by Chaiken. Chaiken signed an affirmation which certified that he was the owner of the stock.

Chopra forwarded the transfer request to his correspondent broker. Chopra's correspondent forwarded the request to Eldon's correspondent. Three days after Chopra's correspondent received the stock, Chaiken sold it for $18,225.00.

In May 1983, the Bartons sold options against the 900 shares of Semi–Conductor. When Bransky learned that Eldon had been given the stock certificates three years earlier, Bransky instituted a search for the missing stock. Bransky then discovered the mistake which had occurred in May

1981 during the transition to the new correspondent broker.

Bransky wrote to Chaiken and requested the return of the stock. Chaiken did not return the stock or its value. The Bartons were forced to cover the stock option sale with other funds.

Thereafter, the Bartons filed suit against Eldon in federal court in December 1983. Eldon filed third-party claims against Chaiken and Chopra. Then in March 1986, Eldon settled the claims initiated by the Bartons, whereupon federal court lost diversity jurisdiction. The federal court dismissed the third-party claims without prejudice in May 1986. In July 1986, Eldon filed the present action against Chaiken and Chopra in state court alleging fraud, conversion and negligence. Prior to trial, Eldon elected not to pursue the negligence count.

Prior to trial, Eldon requested a motion in limine regarding the settlement it accepted in a lawsuit filed against Bache in 1982. The lawsuit concerned the errors during the change in correspondent brokers, including the error in the Bartons' account. The trial court granted the motion.

After a trial by jury in October 1990, Eldon was awarded a verdict of $18,675.00 in compensatory damages and $80,000.00 in punitive damages. Thereafter, Chaiken and Chopra moved for relief from the judgment in November 1990. The motion for relief requested a setoff of the damages award based upon Eldon's July 1984 settlement of the lawsuit it initiated against Bache.

The trial court found that Eldon's claim against Chaiken and Chopra was paid in full and satisfied by the $80,000.00 settlement with Bache. The trial court awarded a setoff in the entire amount of the compensatory award but allowed the punitive damages award to stand. This appeal ensued.

As restated and consolidated, the issues raised by Chaiken and Chopra on appeal and by Eldon on cross-appeal are:

(1) whether the trial court erred in determining that Eldon's claims were not barred by the statute of limitations and that Eldon enjoyed standing to bring the lawsuit;

(2) whether the damages award is supported by sufficient evidence;

(3) whether eight of the final instructions contained misstatements of law and were unsupported by the evidence;

(4) whether Chaiken and Chopra are entitled to a new trial based upon improper closing argument by Eldon's counsel;

(5) whether the trial court erred in granting the motion to setoff compensatory damages based upon the settlement with Bache; and

(6) whether the trial court erred in sustaining the punitive damages award if the compensatory damages award was properly subject to setoff.

■ First, Chaiken and Chopra contend that Eldon's claims for conversion are barred by the two-year statute of limitations. Chaiken and Chopra dispute Eldon's assertion that the limitation period was extended in the present case based upon Chaiken's and Chopra's concealment of the action. The limitation period may be extended for a two-year period, commencing on the date of discovery, when an action is concealed. IND.CODE § 34-1-2-9 (1982 Ed.). The statute provides:

"If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action."

IND.CODE § 34-1-2-9.

The type of concealment necessary for operation of the statute has long been defined:

" 'It must appear that some trick or artifice has been employed to prevent inquiry or elude investigation, or calculated to mislead and hinder the party entitled from obtaining information, by the use of ordinary diligence, that a right of action exists; or it must appear that the facts were misrepresented to or concealed from the party, by some positive acts or declarations, when inquiry was

being made or information sought. . . .'
[Citation omitted]."

*Basinger v. Sullivan* (1989), Ind.App., 540 N.E.2d 91, 94.

As evidenced by his handwritten notation on Chaiken's account summary, Chopra discovered the mistake regarding the stock transfer sometime between October 1981 and December 1981. Chopra informed Dunleavy that he knew of mistakes but that he would not assist in tracing the errors because he considered them "goodies" for his clients. Despite aggressive efforts, Dunleavy did not locate the mistaken stock transfer. When Bransky confronted Chopra about the "goodies" remark, Chopra denied knowledge of errors and contended that the statement was made in jest. Because Dunleavy did not locate a mistake after at least two weeks of intense scrutiny of Chopra's accounts and because Chopra explained his comment and assured Bransky that he did not know of any errors, Dunleavy's and Bransky's attention was diverted from Chopra's accounts. Chopra's actions constituted affirmative steps to conceal the transfer error from Eldon.

Ultimately in June 1982, after Chopra discontinued his employment with Eldon and opened his own brokerage firm, Chaiken sought to sell the 900 shares of Semi-Conductor stock. With Chopra's assistance, Chaiken executed a document stating that he owned the stock. In an effort to discount evidence of his knowledge of the mistake, Chaiken contends that he did not notice the additional 900 shares of Semi-Conductor in his account because he was involved in divorce proceedings and did not open mail including his account summaries. However, at the time that Chaiken sold the stock, it was the sole holding in his account. By executing a document affirming that he was the owner of the stock, Chaiken further concealed the action from Eldon.

Chopra contends that despite evidence that in December 1981 or January 1982 he placed a handwritten notation on one of Chaiken's account summaries indicating that the stock was in the wrong account, he was unaware of the mistake by June when he assisted Chaiken in transferring the stock from Eldon to Chaiken's new account with Chopra's firm. Chopra alleges that, similar to Chaiken, he was distracted by the commencement of his new business during the pertinent time period. It was within the province of the jury to assess the credibility of Chaiken and Chopra. In light of the evidence that Chopra conceded that he had known of the mistake when he placed the notation on the account summary and the evidence that Chopra told Dunleavy that he knew of mistakes but would not divulge them, the jury could have properly determined that Chopra purposely concealed the cause of action.

■ Notwithstanding their conduct, Chaiken and Chopra insist that the statute should not be tolled, because Eldon was at all times in a superior position to learn of the mistaken transfer. According to Chaiken and Chopra, Eldon's lack of diligence forecloses Eldon's reliance upon the tolling provisions. However, the evidence discloses that Eldon used reasonable diligence to identify and rectify the errors. Eldon employed an auditor who devoted as much as four weeks to Chopra's accounts after Chopra commented that he knew of errors but would not disclose them. Eldon's president and the former co-founder of the company worked exhaustive hours to unveil the numerous errors which had occurred and which continued to occur after the auditor was employed.

Chaiken and Chopra argue that Eldon did not use due diligence to discover the mistakes because had appropriate diligence been used, the mistakes would have been discovered. The frailties of the argument are apparent.

Relying upon hindsight, Chaiken and Chopra conclude that, by reviewing 70 pieces of paper, the mistaken transfer would have been discovered. The assertion misrepresents the facts known to Eldon at the time. Eldon knew only that errors were occurring. The errors were not confined to Chopra's accounts. Further, Chopra purposely diverted attention from his accounts by informing Bransky that the

statement regarding knowledge of errors was made in jest.

Although Eldon exercised due diligence to ferret out the numerous errors with which it was plagued, the error within the Bartons' account was concealed by the course of conduct of Chaiken and Chopra. Thus, IND.CODE § 34–1–2–9 is applicable. Eldon was entitled to commence the action "at any time within the period of limitation after the discovery" of the conversion.

■ Further, Chaiken and Chopra complain that even if the statute of limitations was tolled, Eldon did not file suit against them within the appropriate time period. Chaiken and Chopra assert that the cause of action accrued as early as May 1981 when the stock was mistakenly transferred into Chaiken's account. The course of conduct which gave rise to the conversion culminated in Chaiken's execution of a document stating that he was the owner of the shares and ordering their transfer to his account at Chopra's firm. The evidence discloses that the document was executed on June 30, 1982. However, for the purpose of tolling the statute of limitations, the relevant inquiry is the date of discovery of the conversion.

The statute of limitations for the conversion count was tolled until July 1983, when Eldon discovered the cause of action. The Bartons, the true owners of the stock, requested the sale of the shares in May or June of 1983. Once Bransky discovered that the stock was no longer in the Bartons' account, additional effort was made to isolate the mistake and determine which account received the stock. Bransky wrote Chaiken on July 6, 1983, requesting return of the stock. The statute of limitations for the conversion count was tolled until that date.

Eldon filed suit in federal court against Chaiken and Chopra in May 1985 within the two-year statute of limitations for conversion. The claims were timely refiled in state court pursuant to the Journey's Account statute.

IND.CODE § 34–1–2–8 (1988 Ed.); *see Eves et ux. v. Ford Motor Co.* (1972), 152 Ind.App. 34, 42–43, 281 N.E.2d 826, 831.

■ Chaiken and Chopra also contend that Eldon did not enjoy standing to bring the suit, because Eldon did not possess or own the stock converted. Chaiken and Chopra are mistaken. Conversion contemplates a right of action in those who own or control property. *See Seip v. Gray* (1949), 227 Ind. 52, 56, 83 N.E.2d 790, 792. Control over the property is established by evidence that the rightful owners, the Bartons, as well as Chaiken and Chopra made demand upon Eldon to produce the shares for sale. Eldon has standing to pursue the conversion claim inasmuch as Eldon controlled the property and was subject to liability for its loss.

■ Next, Chaiken and Chopra allege that the evidence is insufficient to sustain the award of damages for either conversion or fraud. The argument is two-fold. First, they complain that the evidence does not support a finding of conversion or fraud. Second, they contend that the evidence of damages is insufficient. When reviewing a claim of insufficient evidence, this Court neither weighs the evidence nor judges the credibility of witnesses; rather, the Court may view only the evidence and reasonable inferences therefrom which support the verdict. *Wedge v. Lipps Industries, Inc.* (1991), Ind.App., 575 N.E.2d 332, 338. If substantial evidence of probative value establishes each material element of the claim, this Court will affirm the judgment. *Id.*

■ Criminal conversion is statutorily defined within IND.CODE § 35–43–4–3 (1982 Ed.) which states:

"A person who knowingly or intentionally exerts unauthorized control over property of another commits criminal conversion, a Class A misdemeanor."

*See Midland–Guardian Co. v. United Consumers Club* (1986), Ind.App., 499 N.E.2d 792, 797, *rehg. den.*, 502 N.E.2d 1354, 1355. In *Midland–Guardian, supra,* the appellant questioned the sufficiency of the evidence as to criminal conversion which in turn supported treble damages under a civil statute. This Court stated:

"The critical element in this and other crimes is the *mens rea* requirement. This is the element that differentiates criminal conversion from many other innocuous, every day occurrences. It is also this element that distinguishes this case from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to reach and where treble damages would be inappropriate.

The criminal conversion statute includes two levels of criminal intent, 'knowingly' or 'intentionally' and proof of either will sustain a conviction. 'Knowingly' is the lesser level of intent and is statutorily defined at IND.CODE § 35–41–2–2(b) (1982):

> 'A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so.'

Thus, in order to find a criminal conversion in this case, the evidence, at a minimum, must support the conclusion not only that Midland exerted unauthorized control over UCC's property, but also that Midland was aware of a high probability that this control was unauthorized." (Emphasis in original).

*Id.* at 797–798 (noting that proof of intent to deprive is not an element of conversion but is an element of theft).

Here the evidence, as exhaustively set out above, supports a finding that Chaiken and Chopra were aware of a high probability that their control over the stock was unauthorized. The evidence is sufficient to sustain a finding that their conduct constituted conversion.

 Actual fraud is composed of a false, material representation of past or existing facts, made with knowledge or reckless ignorance of its falsity, which causes reliance to the detriment of the person relying upon the representation. *Medtech Corp. v. Indiana Ins. Co.* (1990), Ind. App., 555 N.E.2d 844, 847. The evidence demonstrates that Chaiken and Chopra knew or were recklessly ignorant of the fact that the stock was not owned by Chaiken prior to the time when they executed a document asserting Chaiken's ownership of the stock. The evidence supports a determination that Chaiken and Chopra engaged in fraudulent conduct.

 As a general rule, damages in an action for conversion are measured by the fair market value of the property calculated at the time of conversion with interest from that date. *THQ Venture v. SW, Inc.* (1983), Ind.App., 444 N.E.2d 335, 338. A conversion of stock or items of fluctuating value may produce an alternative measure of damages. *The Citizens' Street Railroad Company v. Robbins, Administrator* (1895), 144 Ind. 671, 683, 42 N.E. 916, 920, *opinion modified,* 144 Ind. 671, 43 N.E. 649.

> "There are conflicting decisions as to whether the valuation shall be that prevailing at the time of the actual conversion, or the highest price between the conversion and the demand, or the highest price between the conversion and the trial, or the highest intermediate value between the time of conversion and a reasonable time after the owner has received notice of the conversion to enable him to replace the stock. The latter we believe to be the correct rule, and especially is this true where the act of conversion is not willful and fraudulent, but where, as here, it is without benefit to the party charged with conversion, but is from a mere omission to carefully observe the proceedings under which the purchase of the stock was claimed. [Citations omitted]."

*Id.* at 683–684, 42 N.E. at 920. The evidence demonstrates that Chaiken sold the shares for approximately $18,000.00. Documents entered into evidence at trial indicated that in May 1982, the shares were valued at $18,675.00. Further, evidence was introduced at trial that the stock reached a value of $60.00 per share in late June or early July, just prior to Eldon's discovery that the stock had been transferred to the wrong account. Regardless which of the above-outlined measures of damages is employed, the award of $18,675.00 falls within an acceptable range and is supported by the evidence.

The measure of compensatory damages for fraud allows an injured party to recover compensation for damages suffered as a result of the fraudulent representation. *Captain & Co., Inc. v. Stenberg* (1987), Ind.App., 505 N.E.2d 88, 98. "The damage must be the proximate consequence of the injured party's reliance on the fraudulent representations." *Id.* With the assistance of Chopra, Chaiken fraudulently represented to Eldon that Chaiken owned the stock transferred. Then Chaiken was able to sell the stock thereby causing Eldon damage.

Chaiken and Chopra contend that Eldon's actual damages due to the fraud are not in evidence; thus, the damages award for fraud is too speculative. They contend that the only measure of actual damages proximately caused by the fraud is the exact amount which Eldon paid to the Bartons in settlement of the lawsuit. Chaiken and Chopra are mistaken. The evidence discloses that the stock fluctuated in value ranging from $18,675.00 in May 1982, when the Bartons sought access to the stock from Eldon, to $54,000.00 in late June or early July 1982, when Eldon sought recovery of the stock from Chaiken. The evidence supports a damages award within the above range.

Chaiken and Chopra next complain that eight of the final instructions concerning conversion contained misstatements of law and were unsupported by the evidence. Only four of the allegedly erroneous instructions are discussed within the briefs of appellants. The focus of their complaint is that each instruction assumed that Eldon had standing to bring the suit. As noted above, Eldon had standing to bring the suit. Further, each party is entitled to instruct the jury as to his theory of the case. *Captain, supra*, 505 N.E.2d at 98. The substance of the instruction must fall within the issues formed by the pleadings, must be consistent with the evidence, and must correctly state the law. *Id.* The instructions meet the above requirements.

As to one of the instructions, Chaiken and Chopra contend that it does not include a *mens rea* element necessary for a finding that they engaged in a criminal conversion. They assert that the instruction comports with tortious conversion which was not an issue formed by the pleadings. However, the preliminary pretrial order signed by the trial judge framing the issues included Eldon's contention that *a conversion* occurred. The order does not limit the issue to criminal conversion.

Also, it is elementary that when reviewing instructions, this Court construes them as a whole and with reference to one another. *Whisman v. Fawcett* (1984), Ind., 470 N.E.2d 73, 81. No single instruction need contain all applicable law, and the instructions are reviewed in harmony with each other. *Wielgus v. Lopez* (1988), Ind.App., 525 N.E.2d 1272, 1274. In a separate instruction, the jury was instructed as to the elements of criminal conversion. The instruction properly sets forth the *mens rea* element discussed above. No error occurred.

Chaiken and Chopra next allege that they are entitled to a new trial based upon improper closing argument by Eldon's counsel. During closing argument, counsel touched upon the settlement of the lawsuit between the Bartons and Eldon. Chaiken and Chopra moved for a mistrial on the basis that evidence of the settlement, which was the subject of a motion in limine, had not been presented to the jury. Neither Chaiken nor Chopra requested that the jury be admonished.

In order to preserve a ruling with regard to remarks by opposing counsel, a specific objection and a request that the jury be admonished to disregard the remark are required. *Weinstock v. Ott* (1983), Ind.App., 444 N.E.2d 1227, 1240. A trial judge has broad discretion in determining what is improper argument. *Id.* at 1241. A reviewing court will reverse a judgment due to improper remarks by counsel during argument only when it appears from the entire record that the remarks, in all probability, formed the basis for securing an incorrect verdict. *Id.*

Here, the jury was informed through testimony by Bransky that a lawsuit between the Bartons and Eldon had been settled. The amount of the settlement was not presented to the jury. Further, the comments by Eldon's counsel did not elaborate beyond the evidence. No error occurred.

Next, Eldon contends that the trial court erred in granting a setoff of the compensatory damages based upon its settlement of a lawsuit with Bache. In pertinent part, the release negotiated between Bache and Eldon states:

"WHEREAS, Bache and Eldon–Emmor desire to resolve all disputed matters and to release each from the other as to any and all claims arising, directly or indirectly, from the March 6, 1981 agreement and its performance.

\* \* \* \* \* \*

1. Bache shall pay to Eldon–Emmor the sum of $80,000.00.

2. Subject to receipt of the sum set forth in paragraph 1, Eldon–Emmor forever releases and discharges Bache from any and all actions, causes of action, claims, demands, damages (incidental and consequential) and costs (including attorneys fees and other costs of litigation or arbitration) on account of or in any way arising from or related to the relationship of Eldon–Emmor and Bache established by the March 6, 1981 agreement and any and all acts, proceedings, omissions, or matters arising from, related to, indirectly or directly, or otherwise associated with the performance of Bache in connection with the March 6, 1981 agreement, including, but not limited to because of specification, any and all matters undertaken, performed, or omitted by Bache with respect to Eldon–Emmor customers and accounts at Bache.

\* \* \* \* \* \*

8. The execution of this Release shall be a complete, full, and irrevocable termination of the rights of either party under the agreement of March 6, 1981, and, upon such execution, the rights and obligations of either party arising from the March 6, 1981 agreement shall become null, void and of no force or effect...."

■ Generally, the release of one joint tortfeasor acts to release from liability all joint tortfeasors, even when the release attempts to reserve a claim against one of the tortfeasors. *Flagg v. McCann Corp.* (1986), Ind.App., 498 N.E.2d 76, 77, Garrard, J., *dissenting.* Such is the case to avoid a situation where a plaintiff could arrange successive settlements from various tortfeasors thereby obtaining a total recovery in excess of actual damages. *Id.* at 77–78.

In *Flagg, supra,* the plaintiffs executed a release which specifically released the driver of the automobile with which plaintiffs' automobile collided; however, the release explicitly stated that the release would not affect any claims against the owner of the establishment which served alcohol to the defendant-driver who was released. The plaintiffs in *Flagg* contended that because the defendant-driver and the defendant-bar were not "one entity," and because the claims against each constituted independent civil wrongs, the general rule was inapplicable. *Id.* at 78. The *Flagg* court held that the defendants were joint tortfeasors and that the execution of the release as to one operated to release both joint tortfeasors. *Id.* at 78–80.

■ In the present case Eldon also attempts to circumvent the general rule by maintaining that Bache, Chaiken and Chopra are not joint tortfeasors because Bache's conduct was separate from the wrong inflicted by the actions of Chaiken and Chopra. The phrase "joint tortfeasors" embraces several meanings including, " 'those who act together in commiting wrong, or whose acts if independent of each other, unite in causing [a] single injury.' [Citation omitted]." *Flagg, supra,* 498 N.E.2d at 78. Here, the acts of Bache in transferring the stock to Chaiken's account combined with the acts of Chaiken and Chopra to allow a single injury. Bache, Chaiken and Chopra are joint tortfeasors. The general rule that the release of one joint tortfeasor releases all would appear to apply here.

The rule has been sharply criticized inasmuch as other forms of settlement which are not denominated "releases" may avoid a patently unintended result, as when the release specifically reserves a right of action against others.[1] *See* Garrard J., *dissenting, Young v. Hoke* (1986), Ind.App., 493 N.E.2d 1279, 1281. However, the release in the present case does not attempt to exempt other joint tortfeasors.

■ Assuming *arguendo* that Chaiken and Chopra are denominated subsequent tortfeasors, a modification of the rule has evolved. In the case of subsequent tortfeasors, it has been stated that when reviewing the effect of a release an inquiry must be made as to the intent of the parties and whether the injured party received full satisfaction. *See Griffin v. Carmel Bank & Trust Co.* (1987), Ind.App., 510 N.E.2d 178, 182, *citing Wecker v. Kilmer* (1973), 260 Ind. 198, 294 N.E.2d 132.

In the present case, pursuant to the motion for relief from the judgment, the trial court held a hearing and allowed the parties to submit documentation pertinent to the release.[2] Eldon did not submit any documentation from which a conclusion could be drawn that the damage to Eldon concerning the 900 shares of National Semi–Conductor was not completely satisfied by the settlement it received from Bache. *See Lazarrus v. Employers Mut. Cas. Co.* (1977), 173 Ind.App. 452, 364 N.E.2d 140, 141 (if either factor, satisfaction or fulfilling intention of parties, is answered affirmatively, further action is barred).

■ Furthermore, because the law disfavors a "windfall" or a double recov-

ery, the trial court correctly allowed a setoff of the compensatory damages award. A trial court must credit payments made in partial satisfaction of a claim against a remaining liability to prevent a double recovery. *Manns v. State, Dept. of Highways* (1989), Ind., 541 N.E.2d 929, 933. The trial court should make a determination whether the funds received in settlement constituted a partial or total satisfaction of the damages "by simply applying the amount received against the amount of the verdict rendered." *Id.* When the determination of damages results in a figure lower than the settlement amount, the defense of satisfaction or payment would be shown as a matter of law allowing a judgment in favor of the defendant. *Id.* at 934.

Here, the trial court properly determined that the compensatory damages award of $18,675.00 was fully satisfied by the $80,000.00 settlement received from Bache. The evidence demonstrated that the settlement with Bache included the claim regarding the 900 shares of National Semi–Conductor. Although given the opportunity to present parol evidence explaining the settlement, Eldon failed to produce any evidence that further recovery would not be redundant. The trial court properly allowed the setoff of the compensatory damages award.

■ Reasoning that the punitive damages award was unaffected by the setoff, because those damages were aimed at punishing the acts of Chaiken and Chopra and not to compensate Eldon, the trial court allowed the punitive damages award to stand. This Court has considered the effect on punitive damages once a compensa-

---

1. *See Huffman v. Monroe County Com. School* (1992), Ind., 588 N.E.2d 1264, 1267–1268 (release agreements do not discharge others liable for the same harm unless provided in the agreement). The rule operates prospectively. *Id.* However, even if *Huffman* is applicable to the present case, the outcome here would remain unchanged. Even where the release does not serve to discharge others liable for the same harm, "payments do serve to diminish the claim against other tortfeasors...." *Id.* at 1266. Here, Bache's payments to Eldon would be applied to the judgment in the present case, as accomplished by the trial court.

2. Eldon argues that the matter of the effect of the release and whether it constituted full satisfaction of the claim should have been submitted to the jury. Notwithstanding Eldon's success in keeping the matter of the release from the jury through a motion in limine, our Supreme Court in a personal injury case involving joint tortfeasors, *Manns v. State, Dept. of Highways* (1989), Ind., 541 N.E.2d 929, 931–935, thoroughly discussed the considerations in presenting such evidence to a jury and determined that usually the risk of prejudice and misconception weighs against disclosure of the settlements to a jury.

tory award is vacated due to a previous discharge in bankruptcy. *Gomez v. Adams* (1984), Ind.App., 462 N.E.2d 212, 221–227. In *Gomez* it was determined that once the compensatory damages award was vacated, the punitive damages award could not be sustained. *Id.* at 226. "It is elementary to the law of punitive damages that compensatory damages are a prerequisite for any award of punitive damages." *Id.*

The Court in *Gomez* stated:

"In so holding, we are cognizant that the situation presented is unusual because, in the typical case, a claim for which punitive damages might be awarded is excepted from discharge under the Bankruptcy Code. The exception was created to prevent those who commit willful and malicious injuries from seeking shelter from the consequences of their wrongful acts in bankruptcy. However, because Gomez was entitled, as a matter of law, to summary judgment in his favor on the discharge, he is not and cannot be liable for damages of any kind."

*Id.* at 226–227. The decision in *Gomez* was carefully tailored to the facts of that case, based in large part upon the finding that Gomez was entitled to a discharge as a matter of law. No award of damages could be sustained subsequent to the discharge.

The question whether an award of compensatory damages subject to setoff based upon satisfaction will support an award of punitive damages appears to be one of first impression in Indiana. At the heart of the issue is whether proof of an injury for which compensatory damages could be or have been assessed fulfills the predicate of compensatory damages. This line of inquiry prompted the following commentary:

"Of all the difficulties encountered by counsel with respect to the sufficiency of the showing of actual damages to support an award of punitive damages in a civil action, by far the greatest are those that stem from the use and misuse, in both legal and common discourse, of the words 'damage,' 'damages,' and 'injury.' As legal terms, these words are material-

ly distinct. 'Injury' signifies the illegal invasion of a legal right; 'damage' the loss, hurt, or harm that results; and 'damages' the monetary award given to compensate for the damage.

Notwithstanding these distinctions, the terms are frequently used interchangeably by lawyers, judges, and legal writers. The result is confusion. For when a court states that there can be no award of punitive damages in the absence of actual damages, it is not clear whether the court means 'in the absence of proof that a legal right was invaded,' 'in the absence of proof that the plaintiff sustained some loss,' 'in the absence of a loss capable of measurement in dollars and cents,' or 'in the absence of an award of damages to compensate for the loss.'"

*Annot., Punitive Damages—Showing of Actual,* 40 A.L.R. 4th 11, 20 (1985).

Decisions from numerous jurisdictions illustrate that the general rule requiring compensatory damages as a predicate for punitive damages, has been liberally construed to encompass proof of an injury and damage even when damages are not awarded.

*See e.g., Transgo, Inc. v. Ajac Transmission Parts Corp.* (1985 9th Cir.) 768 F.2d 1001, 82 A.L.R.Fed 97, *cert. den.,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (evidence of deliberate and willful disregard of plaintiff's property rights supported punitive damages award);

*The Booth, Inc. v. Miles* (1990), Ala., 567 So.2d 1206, 1208 (in Dram Shop action, when sufficient evidence of actual damages or injury to support an award of compensatory damages, no requirement of a specific award of actual damages in order to support an award of punitive damages);

*Platte' v. Whitney Realty Co.* (1989), Fla.App., 538 So.2d 1358 (punitive damages recoverable where breach of duty found even though plaintiff unable to prove compensatory or actual damages);

*Goodale v. Lachowski* (1989), 97 Or. App. 158, 775 P.2d 888 (proof of actual

harm sufficient basis for award of punitive damages);

*Barker v. Brown* (1989), Tex.App., 772 S.W.2d 507 (plaintiff must demonstrate actual damages prior to an award of punitive damages);

*Tan Jay Internat., Ltd. v. Canadian Indemnity Co.* (1988), 198 Cal.App.3d 695, 243 Cal.Rptr. 907 (proof of actual damage will sustain an award of punitive damages);

*Gulftide Gas Corp. v. Cox* (1985), Tex. App., 699 S.W.2d 239 (basis for punitive damages established through evidence sufficient to support finding of actual damages resulting from fraud in action for breach of contract);

*Kennedy v. Thomsen* (1982), Iowa App., 320 N.W.2d 657 (punitive damages award sustained although no actual damages recovered, court reasoned the fact that actual damages were sustained rather than their reduction to a money judgment satisfied the actual damages prerequisite).

Other jurisdictions which have expressed the same viewpoint include: Alaska, Colorado, Hawaii, New Jersey, New York, Oklahoma, Pennsylvania, South Carolina, and West Virginia. *See Annot., supra,* 40 A.L.R. 4th at 29–33.

The cases are bound by the common theme that the purpose for the predicate award of compensatory damages, to foreclose recovery absent some harm, is fulfilled by proof of the injury and damage.[3] The general rule is based upon two grounds: 1) a court will not punish conduct, no matter how reprehensible, which in fact causes no legal injury; and 2) no separate cause of action for punitive damages exists, punitive damages are derivative of actual damages. *Grimes v. Jones* (1991), Ind.App., 567 N.E.2d 858, 859–860.

In the present case, the purpose for requiring an award of compensatory damages prior to the award of punitive damages has been accomplished because the proof of injury and damage resulted in an award of compensatory damages. A finding that the compensatory damages award was satisfied through a previous settlement is not tantamount to the absence of an award. It follows that the punitive damages award in the present case may be sustained by the award of compensatory damages even though the latter was subject to setoff.

Therefore, the judgment of the trial court is affirmed; the compensatory damages are subject to setoff and the punitive damages award is sustained.

Affirmed.

GARRARD, J., concurs in result.

SHIELDS, J., concurs in part and concurs in result in part with opinion.

SHIELDS, Judge, concurring in part and concurring in result in part.

I agree that Eldon's cause of action is not barred by the statute of limitations but for a different reason than that stated in the majority opinion. In my opinion, Chopra and Chaiken's act of selling the stock in question in June of 1982 constituted the act of conversion. From and after that date, neither Chopra nor Chaiken engaged in any conduct to prevent inquiry, elude investigation, or mislead and hinder Eldon from obtaining the knowledge that a cause of action existed. Therefore, in my opinion, the statute of limitations was not "tolled" by concealment. However, under the discovery rule adopted by our supreme court in *Barnes v. A.H. Robins Co., Inc.* (1985), Ind., 476 N.E.2d 84, the statute of limitations began to run less than two (2) years preceding the initiation of an action by Eldon against Chopra and Chaiken in federal court. "[T]he cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens National Bank* (1992), Ind., 586 N.E.2d 840, 843. Here, the evidence supports the fact find-

---

**3.** In cases in equity, Indiana courts have allowed recovery of punitive damages absent a finding of compensatory damages. *See e.g.,* *Henrichs v. Pivarnik* (1992), Ind.App., 588 N.E.2d 537, 544.

er's determination that Eldon was unaware and, in the exercise of ordinary diligence, could not have been aware of the act of conversion until the Bartons requested the sale of the subject stock. Only after that time did Eldon discover and have reason to discover that the stock was not in the Barton account. Inasmuch as these events occurred in late June or early July of 1983, and this action was timely filed in state court under the Journey Account's statute, the statute of limitations is not a bar to this action.

As the majority opinion recognizes, this action was not limited to an action for criminal conversion. *See* at 345. Therefore, I also concur in result because I disagree with the implication in the majority opinion (*see* at 343–344) that *mens rea* is an element of tortious conversion. *See Coffel v. Perry* (1983), Ind.App., 452 N.E.2d 1066, 1069. Eldon's action is an action for tortious conversion and not criminal conversion.

Otherwise, I concur in the majority opinion.