## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 24 2017, 8:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kristen E. Prinz
Chicago, Illinois

Bryan Bullock
Merrillville, Indiana

ATTORNEYS FOR APPELLEES

Robert A. Anderson
Shannon L. Noder
Merrillville, Indiana

Libby Yin Goodknight
Indianapolis, Indiana

Jacqueline Sells Homann
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Sheila Manhas, M.D.,

*Appellant-Plaintiff,*

v.

Franciscan Hammond Clinic, LLC, Hammond Clinic, LLC, and Deepak Majmudar, M.D., Individually,

*Appellees-Defendants.*

February 24, 2017

Court of Appeals Case No.
45A05-1602-CT-328

Appeal from the Lake Superior Court

The Honorable John Sedia, Judge

Trial Court Cause No.
45D01-1311-CT-216

**Altice, Judge.**

## Case Summary

Sheila Manhas, M.D., (Dr. Manhas) appeals from the trial court's grant of summary judgment in favor of Franciscan Hammond Clinic, LLC (FHC), Hammond Clinic, and Deepak Majmudar, M.D., individually (Dr. Majmudar), (collectively, the Defendants) on her complaint for defamation *per se*, defamation *per quod*, and for violation of Ind. Code § 22-5-3-2, a.k.a. Indiana's blacklisting statute. Dr. Manhas presents several issues for our review, which we consolidate and restate as: did the trial court properly grant summary judgment in favor of the Defendants?

We reverse and remand.

## Facts & Procedural History

On July 28, 2008, Dr. Manhas entered into a two-year employment agreement with Hammond Clinic to work as a full-time, licensed neurologist. On June 11, 2010, Dr. Cynthia Sanders, the Medical Director and Managing Partner of Hammond Clinic and Dr. Manhas's supervisor, notified Dr. Manhas that she was being terminated for cause due to her failure to obtain unrestricted hospital privileges at Community Hospital. Ultimately, however, Hammond Clinic decided not to terminate Dr. Manhas's employment, but instead chose to employ Dr. Manhas through the expiration of her employment agreement, which was set to expire by its own terms on July 27, 2010. According to Dr. Manhas, her employment agreement with Hammond Clinic was not extended because she had informed Hammond Clinic that she was pregnant. On

September 9, 2010, Dr. Manhas filed a sex discrimination claim against Hammond Clinic with the Equal Employment Opportunity Commission.

[4] While Dr. Manhas's discrimination claim was still pending against Hammond Clinic, Franciscan Alliance, Inc. acquired substantially all of the assets of Hammond Clinic and transferred those assets to FHC on or about June 1, 2011. Thereafter, on September 25, 2011, Dr. Manhas and Hammond Clinic settled the discrimination claim and both parties signed a Confidential Severance Agreement, General Release, and Waiver (Settlement Agreement). Section 4 of the Settlement Agreement provided:

> Dr. Manhas will direct inquiries from prospective employers to Karen Weyer, Director of Human Resources, [FHC], . . . who will provide only the following information: dates of employment, last position held, and salary.

*Appellant's Appendix Volume* 3 at 71.

[5] Dr. Manhas claims that during the summer of 2013, she was offered a temporary position as a neurologist at Tripler Army Medical Center (Tripler) in Honolulu, Hawaii. Tripler had hired Platinum Business Corporation (Platinum), a temporary physician placement agency, to complete the credentialing process, which included verification of Dr. Manhas's previous employment. Before compiling the required information, Platinum required Dr. Manhas to sign a Release of Information/Consent to Background Check (Authorization Form). The opening paragraph of this form explained:

A report is being obtained for the purpose of evaluating you for employment. This report may include among other items, criminal background information, confirmation of your educational and employment history, work performance and confirmation of references provided.

*Id*. at 86. By signing the Authorization Form, Dr. Manhas

authorize[d] [Platinum] . . . and or its agents to perform a check of [her] background, references, character, employment, motor vehicle, education and criminal history record bearing on information which may be in any state or local files, including those maintained by both public and private organizations and all public records for the purpose of confirming the information contained in the application and/or obtaining other information which may be material to [her] qualifications for employment.

*Id*. She further "consent[ed] to the release of such information by said individuals and organizations to [Platinum] and authoriz[ed] [Platinum] to consider such information when making decisions regarding [her] employment." *Id*. The form also included the following provision (hereinafter referred to as "the Release"):

I hereby release [Platinum], its corporate affiliates, its current and/or former officers, directors and employees, its authorized agents and representatives and *all others involved in this background investigation* and any subsequent investigations, from any liability in connection with any information they give or gather and any decisions made concerning my employment based on such information.

*Id*. (emphasis supplied).

Gay Lynn Heaney (Ms. Heaney), a credentialing coordinator for Platinum, was in charge of compiling information from Dr. Manhas's previous employers, including Hammond Clinic. Ms. Heaney sent three separate forms to Hammond Clinic, "Attention: Barb".[1] *Id.* at 81. Two of the forms sought an evaluation of Dr. Manhas as a physician and the third document was the Authorization Form signed by Dr. Manhas. One of the evaluation forms (hereinafter referred to as "the Evaluation Form") requested the evaluator to provide an opinion of Dr. Manhas by marking in the appropriate column for "Good", "Fair", or "Poor" in the following areas: technical skills, attitude towards supervision, attitude towards duties, attendance record, and overall employment performance. *Id.*

The Evaluation Form was given to Dr. Sanders, but she refused to complete it because she did not believe her position with FHC authorized her to do so. Eventually, Dr. Deepak Majmudar completed the Evaluation Form on behalf of Hammond Clinic and returned it to Ms. Heaney. Even though Dr. Majmudar had never worked with Dr. Manhas and did not recall ever meeting her, he assessed Dr. Manhas's skills as either "Fair" or "Poor" and further indicated that she was not eligible for rehire, writing "see above" as a reference to the "Fair" and "Poor" ratings. *Id.* Dr. Majmudar also stated that Dr. Manhas had been "terminated." *Id.* Dr. Majmudar was not aware of the

---

[1] Barbara Belligio was the credentialing specialist at FHC and had worked in that capacity during Dr. Manhas's tenure with Hammond Clinic.

Settlement Agreement from the discrimination action. Ms. Heaney forwarded the information provided by Dr. Majmudar to Tripler. Based in part on the poor evaluation, Tripler ultimately decided not to hire Dr. Manhas.

[8] Dr. Manhas retained an attorney, who, on Dr. Manhas's behalf, corresponded with Dr. Majmudar regarding his responses on the Evaluation Form. Dr. Majmudar reviewed Dr. Manhas's credentialing file and confirmed that he made false and inaccurate statements about Dr. Manhas. Specifically, there was nothing in Dr. Manhas's file that indicated she was not eligible for rehire. Dr. Majmudar then wrote two letters, one to Dr. Manhas's attorney and one to Ms. Heaney. In the letters, Dr. Majmudar apologized for the inaccuracies in his evaluation of Dr. Manhas, noting that Dr. Manhas left Hammond Clinic in good standing and that he would recommend her without reservation. He further admitted that he "was wrong to make those statements" and that he "completely and whole heartedly regret[ted] and retract[ed] [his] statements on the reference evaluation to Platinum []." *Id*. at 133. Dr. Majmudar further noted that contrary to his responses, Dr. Manhas received positive feedback regarding her performance at Hammond Clinic.

[9] On November 4, 2013, Dr. Manhas filed her initial complaint for defamation *per se*, defamation *per quod*, and for violation of Indiana's blacklisting statute, I.C. § 22-5-3-2, naming Hammond Clinic, Dr. Majmudar, and FHC as defendants. She filed an amended complaint on January 16, 2015. On January 28, 2015, Hammond Clinic filed its amended answer as well as a counterclaim alleging that Dr. Manhas breached the terms of the Settlement Agreement that

arose from the discrimination claim. On February 23, 2015, FHC and Dr. Majmudar filed their answer and a similar counterclaim. Hammond Clinic subsequently withdrew its counterclaim, but FHC's counterclaim remains pending before the trial court.

[10] On July 6, 2015, FHC and Dr. Majmudar filed a motion for summary judgment, arguing that the Release contained in the Authorization Form relieved them of any and all liability arising out of the responses provided in the Evaluation Form. Hammond Clinic filed a motion to join in FHC and Dr. Majmudar's summary judgment motion, which was granted by the trial court on December 8, 2015. The trial court held a summary judgment hearing on January 5, 2016. Three days later the trial court entered its order granting summary judgment in favor of the Defendants. The trial court concluded that the language of the Release was "explicit and unambiguous" that Dr. Manhas was releasing designated parties from all liability. *Appellant's Appendix Volume 2* at 32. The court implicitly determined that the catch-all phrase in the Release – "all others involved in this background investigation" – encompassed the Defendants and thus, the Defendants were released from any liability arising out of information provided on the Evaluation Form. *Appellant's Appendix Volume 3* at 86. The trial court therefore granted summary judgment in favor of the Defendants.

[11] On January 19, 2016, the trial court determined that there was no just reason for delay and directed entry of final judgment for Hammond Clinic. A similar

order was entered for FHC and Dr. Majmudar on February 1, 2016. Dr. Manhas now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[12] We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of ... the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting Ind. Trial Rule 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

[13] The initial burden is on the party moving for summary judgment to "demonstrate ... the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761-62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that [s]he was not improperly denied h[er] day in court." *McSwane v.*

*Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

[14] The sole issue before us is whether the Release signed by Dr. Manhas applies to the Defendants. A release, as with any contract, should be interpreted according to the standard rules of contract law with the parties' intentions regarding the purpose of the document governing. *Stemm v. Estate of Dunlap*, 717 N.E.2d 971, 975 (Ind. Ct. App. 1999) (citing *Huffman v. Monroe Cty. Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1266-67) (Ind. 1992)). The interpretation of the language of a release presents a question of law and is therefore appropriate for summary judgment proceedings. *See TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust*, 904 N.E.2d 1285, 1287-88 (Ind. Ct. App. 2009).

> When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact-finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless.

*T-3 Martinsville, LLC v. U.S. Holding, LLC*, 911 N.E.2d 100, 111 (Ind. Ct. App. 2009), *clarified on reh'g*, 916 N.E.2d 205, *trans. denied* (citation omitted).

[15] Here, we note that the Defendants were not parties to the Authorization Form. They seek the protection afforded by the Release as third-party beneficiaries. Generally, only parties to a contract or those in privity with the parties have rights under the contract. *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1314-1315 (Ind. 1996). However,

> [o]ne not a party to an agreement may nonetheless enforce it by demonstrating that the parties intended to protect him under the agreement by the imposition of a duty in his favor. To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed.

*Id.* at 1315 (internal citation omitted). The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed. *Id.* However, it is not necessary that the intent to benefit a third party be demonstrated any more clearly than the parties' intent regarding any other terms of the contract. *Id.*

[16] Dr. Manhas argues that when reading the Authorization Form as a whole, it is clear that Platinum "drafted a broad document to protect itself from liability,

and that the words 'all others involved' [in the Release] are used as a catch-all phrase to protect [Platinum]," not former employers. *Appellant's Brief* at 17. She points out that the Authorization Form defined Platinum as the "Employer" and thereafter limited liability for Platinum's "current and/or former officers, directors and employees, its authorized agents and representatives and all others involved in this background investigation." *Appellant's Appendix Volume 3* at 86. Because there is no comma separating "all others involved," Dr. Manhas maintains that such phrase is prefaced by the phrase "[Platinum's] authorized agents and representatives." *Id.* In other words, Dr. Manhas argues that the language used clearly evinces an intent that the Release does not extend to the Defendants. At the very least, Dr. Manhas argues that there is an ambiguity with regard to who falls within the scope of the Release such that summary judgment was improper.

[17] Although finding that the language of the Release was "explicit and unambiguous," the trial court did not interpret such provision the same as Dr. Manhas. *Appellant's Appendix Volume 2* at 32. Rather, the trial court sided with the Defendants and concluded that the language of the Release clearly provided that the Defendants were released of all liability for the responses provided on the Evaluation Form, regardless of the accuracy thereof. In so concluding, the trial court found "particularly instructive" this court's decision in *Eitler v. St. Joseph Reg'l Med. Ctr. South-Bend Campus, Inc.*, 789 N.E.2d 497 (Ind. Ct. App. 2003), *trans. denied. Appellant's Appendix Volume 2* at 31.

[18] In *Eitler*, a nurse sought employment with a new healthcare agency. As part of her application, she was required to sign and then send to her former employer a Confidential Reference Check Report that requested an evaluation of the nurse as "above average," "average," or "below average" in a number of different categories and indication of whether the nurse would be rehired. The form contained an authorization/release indicating that the nurse "authorize[d] the addressed individual [her former supervisor] . . . to furnish an employment reference (verification/evaluation) to [prospective employer]" and that she "release[d] *both parties* from any and all liability for damages in the furnishing and receiving of this information." *Eitler*, 789 N.E.2d at 499 (emphasis supplied). After the nurse received a negative review, she filed suit against her former employer and supervisor claiming defamation and a violation of the blacklisting statute. This court affirmed the trial court's grant of summary judgment in favor of the former employer and supervisor, concluding that the nurse's claims were barred by the "explicit and unambiguous" language of the release. *Id*. at 501.

[19] Dr. Manhas asserts that the trial court's reliance on *Eitler* is misplaced in that *Eitler* is wholly distinguishable from this case. We agree. In *Eitler*, the release provision specifically identified and named the former employer and the prospective employer and expressly released "both parties" – a clear reference to those named—from any liability arising out of information exchanged between the named parties. Here, on the other hand, the Release provision does not explicitly identify any of the Defendants. Indeed, the Authorization

Form identifies only Dr. Manhas and Platinum and the Release explicitly applies to Platinum's "corporate affiliates, its current and/or former officers, directors and employees, its authorized agents and representatives and *all others involved in this background investigation*." *Appellant's Appendix Volume 3* at 86 (emphasis supplied).

[20] We now turn to interpretation of the Release at issue in this case. "To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them." *Lake Cnty. v. Rollins*, 130 U.S. 662, 670, 9 S.Ct. 651, 32 L.Ed. 1060 (1889). *See also*, *Hamilton Cnty. Dep't of Pub. Welfare v. Smith*, 567 N.E.2d 165, 169 (Ind. Ct. App. 1991) ("In addition, where the meaning of a particular clause or phrase is in doubt, the court should examine the grammatical structure of the clause in order to ascertain its meaning."). *FLM, LLC v. Cincinnati Ins. Co.*, 973 N.E.2d 1167, 1176 (Ind. Ct. App. 2012). "As a matter of strict grammatical construction, the descriptive words in a phrase should, in the absence of punctuation, be referred to their nearest antecedent . . . ." *First Nat'l Bank of Peoria v. Farmers' & Merchants' Nat'l Bank of Wabash*, 171 Ind. 323, 86 N.E. 417, 423 (1908).

[21] Here, the "all others involved" language is not separated by commas and is prefaced by "authorized agents and representatives" of Platinum. Giving full effect to its grammatical structure, the catch-all phrase refers to "all others involved" with Platinum's authorized agents and representatives. Further,

there is no language in the Authorization Form or the Release from which we can decipher any intent to extend the protection of the Release to third parties, i.e., former employers. A plain reading of the Authorization Form as well as the Release contained therein reveals that Platinum cast a wide net to relieve itself of any liability and clearly evinces an intent that the Release does not extend to the Defendants.

[22] FHC and Dr. Majmudar's[2] argument to the contrary is disingenuous, if not misleading. In arguing that the Release extends to them through its use of the phrase "all others involved," FHC and Dr. Majmudar misrepresent the evidence in the record. Specifically, FHC and Dr. Majmudar assert that "[p]ursuant to the Release, Dr. Manhas 'released [Platinum], **its** corporate affiliates, **its** current and/or former officers, directors and employees, **its** authorized agents and representatives[.]'" *Brief of FHC and Dr. Majmudar* at 30 (emphasis and alterations in original). They then continue, stating that "Dr. Manhas also 'released . . . **all others involved in this background investigation**[.]" *Id.* (emphasis and alterations in original). As set forth above, these two parts of the Release are not separate and independent clauses as suggested by FHC and Dr. Majmudar.

[23] As we noted, the phrase "all others involved in this background investigation" is not set off by commas and is prefaced by reference to Platinum's "authorized

---

[2] FHC and Dr. Majmudar filed a joint brief. Hammond Clinic filed a separate brief, albeit incorporating many of FHC and Dr. Majmudar's arguments.

agents and representatives." When read in context, it becomes evident that the general, catch-all phrase "all others involved" is directed at Platinum, not former employers as third-party beneficiaries. In sum, we find the language of the Release to be unambiguous. We, however, interpret the language differently than that urged by the Defendants.

Having found the Authorization Form, and more specifically, the language of the Release, to be unambiguous, we need only look within the four corners of the document. The intent as expressed therein is clear—the Defendants, i.e., third-party beneficiaries, do not fall within the scope of the Release.[3] Summary judgment in favor of the Defendants is reversed, and this case is remanded to the trial court for further proceedings.

Judgment reversed and remanded.

Riley, J. and Crone, J., concur.

---

[3] With regard to public policy considerations discussed by the parties, we agree that free flow of information is critical. Equally as critical, however, is that the information be accurate.