Joycelyne A. **STAMPER** and **Scott A. Stamper, individually and as parents and natural guardians of Cristen R. Stamper, a minor, Lauren K. Stamper, a minor, Brandon S. Stamper, a minor, and Alicia N. Stamper, a deceased minor, Appellants–Plaintiffs,**

v.

**HYUNDAI MOTOR COMPANY, Hyundai Motor America, and Five Star Motors of Lafayette, Inc., d/b/a Bob Rohrman Hyundai, Appellees–Defendants.**

No. 54A05–9607–CV–261.

Court of Appeals of Indiana.

Aug. 11, 1998.

Transfer Denied December 22, 1998.

James R. Fisher, Michael A. Wilkins, Debra H. Miller, Ice Miller Donadio & Ryan, Indianapolis, for Appellants–Plaintiffs.

Richard A. Huser, Julia Blackwell Gelinas, Nelson D. Alexander, Locke Reynolds Boyd & Weisell, Indianapolis, Michael T. Pulaski, Robert W. Maxwell, Pulaski Gieger & LaBorde, New Orleans, LA, for Appellees–Defendants.

## OPINION

ROBERTSON, Senior Judge

### Case Summary

Appellants–Plaintiffs, Joycelyne and Scott Stamper, individually and as the parents of Cristen, Lauren, Brandon, and Alicia (collectively "Stampers"), appeal from two jury verdicts in favor of Appellees–Defendants, Hyundai Motor Company, Hyundai Motor America, Five Star Motors of Lafayette, Inc., d/b/a Rob Rohrman Hyundai (collectively "Hyundai"). We affirm.

### Issues

The Stampers raise five issues which we restate as:

I. Whether the trial court erred in permitting defense counsel to comment upon opposing counsel during opening argument;

II. Whether the trial court properly admitted or excluded new and undisclosed exhibits and expert theories;

III. Whether the trial court properly admitted two crash test videos;

IV. Whether the trial court properly instructed the jury regarding expert witness credibility; and,

V. Whether the trial court properly instructed the jury regarding duty of care.

### Facts and Procedural History

The facts most favorable to the verdict show that

On March [27], 1991, Joycelyne Stamper was transporting four of her children to Indianapolis in her 1990 Hyundai Excel. While travelling [sic] along State Road 32 in Montgomery County, Indiana, the Stampers were involved in a collision. Alicia Stamper was killed, and Cristen Stamper was ejected from the vehicle and sustained severe and permanent brain damage.

On March 16, 1992, the Stampers filed suit against Hyundai alleging that their Hyundai Excel, which had split in half through the passenger compartment along a seam of welds, was in a defective condition and unreasonably dangerous. *Hyundai Motor Co. v. Stamper,* 651 N.E.2d 803, 805 (Ind.Ct.App.1995).

In January 1995, the case was tried before a jury which rendered a verdict in favor of Hyundai for the Stampers' deceased child but failed to reach a verdict in regard to the Stampers' injured child or Joycelyne's claims for loss of services, financial losses and emotional injuries. In January 1996, a second trial was held and the jury again rendered a verdict in favor of Hyundai on the other claims.

### Discussion and Decision

#### I. Misconduct of Counsel

The Stampers argue that the trial court committed reversible error when it permitted defense counsel to make comments about plaintiff's counsel and, presumably, failed to *sua sponte* declare a mistrial. During opening arguments in the 1995 trial, counsel for Hyundai stated, apparently in response to the Stampers' opening argument:

Now Mr. Fisher is from the firm of Ice and Miller. The largest firm in Indianapolis. Big, big firm. And you know, recently the Indianapolis [Star?] said that people in Mr. Fisher's firm, one of the associates on this case was involved in high priced ambulance chasing is just plain wrong. We now have removed bodies from the scene. An investigator was snapping pictures. Now that is not what this is about today.

(R. 3901).[1] The Stampers failed to make an objection to these remarks.

The question of whether the conduct of counsel was so improper as to preju-

---

1. The Stampers' opening argument included the following remarks:

 Well if you make a vehicle like this how on earth do you defend it? Well you are going to hear how they defend it, how they defend it in this country is that they've got a catastrophic loss defense team hooked together, you've met some of them, Mr. Pulaski and his associates at New Orleans are not here because New Orleans is the nearest place there is a law firm they are here because they are part of Hyundai's uh disaster team if that is the right word for it.

 (R. 3870).

dice the fair conduct of the trial is within the sound discretion of the trial court, because the trial court has the advantage of observing the events and their effects at trial. *Becker v. Plemmons,* 598 N.E.2d 564, 567 (Ind.Ct. App.1992). In order to preserve a ruling with regard to remarks by opposing counsel, a specific objection and a request that the jury be admonished to disregard the remark are required. *Chaiken v. Eldon Emmor & Co., Inc.,* 597 N.E.2d 337, 345 (Ind.Ct.App. 1992). We must presume that the jurors would have followed the trial court's admonishment. *See Becker,* 598 N.E.2d at 567. A reviewing court will reverse a judgment due to improper remarks by counsel during argument only when it appears from the entire record that the remarks, in all probability, formed the basis for securing an incorrect verdict. *Chaiken,* 597 N.E.2d at 345.

■ To avoid waiver, the Stampers contend that no useful purpose would have been served by objecting to these comments. We disagree. The trial could would have been given the opportunity to exercise its discretion to determine whether the remarks were improper and if so, to admonish the jury. Following a ruling on such an objection, the Stampers could have moved for a mistrial, which was not done, and permitted the trial court to rule thereon. This court is not in as favorable a position as the trial court to determine the possible effect of these remarks upon the jury, and an objection is necessary to preserve the issue on appeal.

The Stampers also argue that *Chaiken* is distinguishable because that case involved a comment upon the existence of insurance. The Stampers posit that there are two types of misconduct: improper reference to inadmissible evidence and improper statements about opposing counsel. We decline to make

such a distinction. The harmful effect of improper conduct by counsel is not measured by the target of the remark, but by its influence upon the jury.

We conclude that the Stampers' failure to object to defense counsel's remarks results in waiver of this issue on appeal.

## II. Admission of New or Undisclosed Evidence

### New Crash Test

The Stampers argue that the trial court erred when it permitted Hyundai to show a video tape to the jury which depicted a crash test conducted during the 1995 trial, and undisclosed to Stamper. After the close of the Stampers' case-in-chief, a crash test was conducted during a weekend break in the trial, utilizing a 1990 Excel modified to eliminate some of the alleged design defects.[2] The test results and video tape were not mentioned during direct or re-direct examination of Hyundai's defense witness, but were brought out on re-cross examination:

Q. ... If we simply looked at the strength of this sill outside the seam, compared to the strength of these two bolts we'd know which one would fail that failed next wouldn't we?

A. Well no sir there's a more direct way. *I have test data* that shows that if you make that seam indefinitely strong you just tear through the steel at a point forward of this the seam. You don't tear the bolts off you tear through the steel.

. . . .

A. I don't know what the value will be all I can tell you is *if you run the test that you are talking about* and you

give it back the strength we intended it to have instead of the 30% strength that this seam gives it, and see if fixing that sill, *what will happen in another crash test,* did they do that?

. . . .

Q. But Hyundai didn't ask you to test any vehicle but the Hyundai and *they didn't ask you to test that vehicle with a good sill in it* instead of the sill that comes with it?

(R. 4868–69) (emphases added).

---

**2.** This test was apparently conducted in response to the suggestion of the Stampers' counsel, during recross examination of another Hyundai expert:

Q. Okay. And one of the questions in this case is whether it is reasonable to design your weak spot of the vehicle in the middle of the passenger compartment instead of someplace a lot less dangerous, now did Hyundai say to you, since the issue here is whether this is a reasonable design, let's go ahead and fix this rocker sill seam, let's

make the seam indefinitely rigid you'll tear through the steel. You will not break those bolts.

A. ... The weakest part would come apart but there's something wrong with your premise because *I have test data* that show that the bolts don't come apart next. What happens next is you tear the steel in the body sill.

Q. *Because you've taken an Excel and you have made this infinitely strong and you've crash tested it?*

A. Yes.

Q. *Did you remember to bring the data of the I want to see the infinitely strong connection that you fashion there.*

A. Sure okay. I just happen to have that. *I have a video tape and I have some data that show that.*

(R. 5085–87) (emphases added).

On further re-direct examination, Hyundai requested to show the new video tape to the jury. The Stampers objected that the exhibit was not identified before trial and counsel had no opportunity to depose witnesses, to view the tape, the test procedures, or the test vehicles. When this objection was overruled, a hearing was held and the Stampers requested a continuance should the trial court permit the jury to view the tape. The trial court found that the failure to disclose the test was offset by the fact that the test came to light in response to the Stampers' questioning, and permitted the jury to view the tape. The trial court also granted the Stampers an opportunity to study the tape, do further discovery, and run additional tests. The Stampers also conducted further re-cross examination of the witness.

Approximately six days later, the Stampers presented rebuttal testimony from another expert witness regarding the new crash test.[3] This witness apparently had been given an opportunity to evaluate the testimony and data presented earlier. The Stampers

did not recall Hyundai's expert witness who had conducted the test.

 The trial court has broad discretion in ruling on the admissibility of evidence and in determining its relevance. *Mitchell v. Mitchell,* 685 N.E.2d 1083, 1087 (Ind.Ct.App. 1997). We will disturb its ruling only upon a showing of abuse of that discretion. *Id.* The duty to seasonably supplement a discovery response is absolute and is not predicated on a court order.[4] *Lucas v. Dorsey Corp.,* 609 N.E.2d 1191, 1196 (Ind.Ct.App.1993). Where there has been a failure to comply with discovery procedures, the trial judge is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated. *Vanway v. State,* 541 N.E.2d 523, 527 (Ind.1989). Where remedial measures are warranted, a continuance is usually the proper remedy, but exclusion of evidence may be appropriate. *Id.*

 Hyundai had a duty to disclose the new crash test data and video tape if it intended to use them as a trial exhibit. Assuming that Hyundai planned to introduce the video tape as evidence, though it did not do so until re-direct examination of the witness, this duty to disclose did not arise until the previous day when the video was created. It was within the trial court's discretion to allow or exclude the evidence or permit the Stampers a continuance.

The Stampers contend that the new crash test evidence should have been excluded because no opportunity was provided to view the video tape before it was shown to the jury. Hyundai counters that the evidence was admitted in response to the Stampers' re-cross examination of the expert witness regarding additional crash tests.

 Once a party raises a subject on cross-examination, it is permissible for the opposing party to pursue that subject on redirect examination. *Hopkins v. State,* 668 N.E.2d 686, 690 (Ind.Ct.App.1996). Addi-

---

3. We are unable to ascertain from the record whether additional witness testimony was presented during this time period, or whether the trial was in recess.

4. The trial court had issued a pre-trial order requiring the parties to "update and supplement their witness list and *exhibit list,* if any update or supplement is to be done, on or before November 1, 1994." (R. 1159) (emphasis added).

tionally, if the court, in exercising its discretion, permits evidence to be introduced during re-direct examination for the first time, this will not constitute reversible error unless the opposing party is prevented from further questioning the witness on the subject and from presenting other evidence to contradict the testimony if it is prejudicial to his case. *Jones v. State*, 600 N.E.2d 544, 547 (Ind. 1992). The Stampers not only conducted further re-cross examination, but were given an opportunity to conduct additional discovery regarding the new crash test. If the trial court erred in allowing the jury to view the video tape, it was not reversible error.

### Computer Animation

The Stampers contend that the trial court erred when it admitted in the 1996 trial a computer animation prepared by Hyundai, but excluded plaintiff's animation. The Stampers assert that the trial court excluded the animation for the reason that it had not been prepared prior to the deposition of the expert witnesses, but admitted Hyundai's animation over the Stampers' objection that it also had not been prepared prior to deposition of Hyundai's expert witnesses.

■ It is unclear from the Stampers' brief whether the alleged error is the admission of Hyundai's animation or the exclusion of plaintiff's animation. The Stampers admit that Hyundai's animation was disclosed and a copy was provided on the date designated for exchange of exhibits. Also, the Stampers' own animation was provided to Hyundai on the same date. The Stampers' contention seems to be that Hyundai's animation should have been excluded because it was not complete when the expert witness who prepared it was deposed. The Stampers do not dispute that the witness was questioned at length during deposition regarding the preparation of the exhibit. In addition, the photographs upon which the animation was based were provided during the deposition. We see no error. The exhibit was disclosed, a copy timely provided, and discussed during deposition. The Stampers do not discuss whether any attempt was made to redepose the witness after receipt of the exhibit. The

trial court did not abuse its discretion in admitting Hyundai's animation.

■ The Stampers argue that the trial court erred in excluding plaintiff's animation "for the reason that it had not been prepared prior to the deposition of plaintiff's experts." Appellant's Brief at 18. The exhibit was actually excluded for lack of foundation. The Stampers' animation was prepared to illustrate the opinions of an expert witness who testified at the 1995 trial, but was not present for the 1996 trial, nor deposed for the second trial. When the animation was first discussed at trial with the expert witness who assisted in its preparation, Hyundai objected to the exhibit's foundation, specifically regarding the timing of events depicted in the animation. The trial court allowed the questioning to proceed, but stated that it may take two or three witnesses to adequately lay the foundation for the exhibit.

When the Stampers offered the animation into evidence during examination of a later witness, Hyundai again objected, claiming a lack of foundation. The trial court sustained the objection for insufficient foundation and for the reason that Hyundai did not have an opportunity to depose this particular witness concerning the animation.

The Stampers again offered the animation into evidence during cross examination of a defense witness for impeachment purposes. Hyundai's objection regarding lack of foundation was again sustained. The Stampers present no argument to this court to show that a proper foundation was laid for the exhibit, or that the trial court abused its discretion in excluding the exhibit for lack of foundation. We conclude that the trial court did not err.

### Seat Belt Evidence

The Stampers next argue that the trial court erred when it permitted testimony concerning a new and previously undisclosed defense theory relating to seat belt usage. At both trials, there was considerable disagreement regarding whether Cristen, who occupied the center rear seat at the time of the accident and was ejected from the vehicle, was wearing a seat belt. During the first

trial, defense expert Carr testified concerning his visual inspection of the deformed shape of the left and right rear seat belt anchor brackets and the deformed paint surface of the brackets. He stated that

> you can actually see the imprint of the webbing into the paint.... There's been a force through the webbing of the belt surface to put a mark in the paint and disrupt the paint surface. There's no such thing on the center belt confirming there's [no] substantial load or there's no crash type load put through the ... paint surface.

(R. 4979–80). Carr concluded that the center rear seat belt was not fastened at the time of the accident.

Following the 1995 trial, the Stampers hired expert witness Cantor to conduct microscopic examination of the seat belt webbing and anchor brackets. At a subsequent deposition, Carr stated that he had no opinion concerning Cantor's deposition testimony, had not done any microscopic examinations prior to the first trial, and had no opinion regarding the imprinting marks caused by the webbing on the bracket, as contained in Cantor's deposition. During the 1996 trial, Carr testified that "on the center rear buckle ... there are some small marks, isolated marks but there is no pattern of occupant loading." (R. 6597). The Stampers accused Carr of false testimony, based on his testimony in the first trial that he observed no marks on the center rear seat belt anchors and his testimony in the second trial that some small marks were present.

During cross examination of Carr by the Stampers, the following exchange took place:

Q. And you were able to give the testimony under oath that there was no imprinting of the webbing because at that time you knew Mr. Cantor or no other expert on behalf of the plaintiff had looked at those belts under a microscope and see if they were there?

A. No, that's not a fair characterization. I can explain that if that would be helpful.

Q. I think Mr. Carr, if you want this jury to believe any of your testimony that *you have to explain that.*

(R. 6666–67) (emphasis added). Carr began to explain why a microscope was not necessary to verify crash loading of the seat belt anchor brackets, but was not able to complete his explanation. On re-direct examination the following day, Hyundai sought to allow Carr to continue his explanation. The Stampers objected that such testimony would involve Carr expressing his opinion about Cantor's testimony, about which Carr had stated in his deposition that he had no opinion. Hyundai assured the trial court that Carr would only explain his own testimony and would not comment on Cantor's testimony. The trial court overruled the Stampers' objection.

Carr then attempted to demonstrate that seat belt webbing can leave impressions on an anchor bracket that are not a result of crash loading. Carr used a video microscope to show how simple thumb pressure on the seat belt webbing can leave a microscopic impression on the anchor bracket. He concluded that relatively small loads can leave such impressions, but that a crash type load would leave indications visible to the naked eye.

The Stampers argue that Carr's testimony amounts to a new and undisclosed expert theory. We disagree. Carr testified repeatedly that his opinion had not changed from the first trial, in spite of the Stampers' accusations of false testimony. The Stampers contend that Carr's video demonstration violated a pre-trial order prohibiting new expert theories and tests. We need not decide whether the in-court demonstration violated the trial court's pre-trial order. The trial court determined that during cross examination of Carr, the Stampers had asked Carr to explain his testimony regarding seat belt webbing imprinting and the use of a microscope. As stated above, the trial court has the discretion to permit new evidence to be presented during re-direct examination, as long as the opposing party is permitted further questioning and the admission of other evidence. *See Jones,* 600 N.E.2d at 547.

The Stampers also argue that the trial court erred in admitting previously undisclosed exhibits. These exhibits apparently

consisted of several enlarged photographs of seat belt anchor brackets under magnification. The Stampers first objected to these exhibits when they were observed in the courtroom during Carr's direct examination, following a weekend break. At that time, Hyundai had not yet offered the exhibits into evidence. The trial court did not rule on the admissibility of the exhibits and permitted testimony to proceed. The Stampers identify these exhibits as Defendant's 4X, 4Y, 4Z, 5A, 5F, 5G, 5E, 5D, 5B, and 5C. When these exhibits were later offered into evidence, the Stampers stated they had no objection. (R. 6600–03). Therefore, the Stampers have not preserved this issue for review.

The Stampers next contend that the trial court erred in permitting defense expert MacKay to testify regarding a new and undisclosed theory at the second trial. The Stampers state that at MacKay's deposition taken before the second trial, MacKay testified that the marks on the center rear seat belt anchor bracket which Cantor photographed under magnification were ordinary wear and tear.[5] During the second trial, MacKay testified that post-accident handling or contact with other portions of the vehicle during the accident were possible candidates for causing the marks on the center rear bracket. The Stampers did not object to MacKay's testimony.

During cross examination of MacKay, the following dialogue occurred:

Q. Well let's make it very clear. You are not claiming Hyundai is not saying that these imprinting marks were added at some time post-accident are you?

A. What I am saying and what you can see if you look at it now is that there are more marks on the coating than the photograph taken at the time the anchorage was taken out suggests and I'm not suggesting that is anything other than the sort of handling that has been going on since the anchorages have been out of the belt out of the car.

5. MacKay testified that in his opinion, the microscopic marks on the center rear bracket were

(R. 6948–49). We disagree with the Stampers that MacKay's testimony indicates a new defense theory. MacKay did not waver from his opinion that the marks on the center rear bracket "represent the sort of wear and tear and handling," (r. 7011), and were not "indicative of a crash load." *Id.* The Stampers have not shown that the trial court abused its discretion regarding the admission or exclusion of evidence.

### III. Admission of Crash Test Videos

The Stampers argue that the trial court erred in admitting two video tapes depicting crash tests. They contend that the videos were not relevant because of differences between the tests and the actual accident, and that the videos were misleading because of "fictitious" soundtracks.

The first video was of a crash test conducted on July 25, 1994 and was admitted in both the 1995 trial and the 1996 trial. The second video was made on January 30, 1995 and was admitted during the 1996 trial. Both videos contained sounds from the high speed cameras, the engines powering the underground cable which propelled one of the test vehicles, and sound from the crash itself. During the 1995 trial, the Stampers offered the July 25, 1994 video into evidence as a plaintiff's exhibit and of course did not object when Hyundai later offered the same video as a defense exhibit. The only error which the Stampers' can allege, therefore, is concerning the 1996 trial.

In the second trial, when Hyundai offered the July 25, 1994 video into evidence, the Stampers' stated that they had "no objection to it being shown with the understanding that's it [sic] not purported to look like this accident and I'd also request that there be no sounds as sounds were irrelevant to this occasion, and would also be misleading." (R. 6528). The Stampers' only objection was to the soundtrack. Because Hyundai had explained to the jury what each of the sounds were, the trial court admitted the exhibit.

Later in the second trial, Hyundai offered the January 30, 1995 video into evidence. The Stampers stated that

"obviously of ... a used belt that's been in a car for quite some time." (R. 6955).

[w]e would have the same objections with respect to the other crash test, first we want an understanding or confirmation that it is not being offered as a demonstration of what this accident looked like, assuming that is the case, we would object to the sounds being played since they attempt to dramatize an event that was not dramatic in the real world but other than those objections, we have none.

(R. 6629). Thus, the Stampers' only objection is concerning the soundtrack.

■ In ruling on the relevancy of evidence, the trial court is accorded wide latitude to determine the probative value of evidence in contrast to its prejudicial impact. *Barnes v. Barnes*, 603 N.E.2d 1337, 1343 (Ind.1992). It is only when the evidence is merely marginally relevant that the trial court has discretion to exclude it by balancing the probative value against prejudicial impact. *Id.* Because the video soundtracks contain sounds of the two vehicles colliding, in addition to the other noises of which the Stampers complain, they are at least marginally relevant to one of the issues in this case, that is, the severity of the accident. Thus, it was within the trial court's discretion to

weigh the exhibit's relevancy against any tendency to mislead the jury.

The trial court was in a better position to conduct this balancing than is this court now.[6] All of the sounds accompanying the video tapes were explained to the jury. We presume that the jury was capable of distinguishing the various sounds. We conclude that the trial court did not abuse its discretion in admitting the video tapes and permitting them to be played to the jury.

### IV. Jury Instruction on Expert Witness Credibility

■ The Stampers argue that the trial court wrongly refused their tendered jury instruction regarding false testimony.[7] Hyundai does not argue that the instruction is an incorrect statement of the law, but contends that its substance was covered by other instructions.

■ The decision to give or deny a tendered jury instruction is largely left to the sound discretion of the trial court. *Taylor v. State*, 629 N.E.2d 852, 855 (Ind.Ct.App.1994). We review the trial court's decision only for abuse of that discretion. *Id.* In evaluating

---

6. Neither of the videos are contained in the record of the proceedings.

7. The trial court gave Instruction No. 4 as follows:

> You are the exclusive judges of the evidence, the credibility of the witnesses, and the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe or to know; the manner and conduct of the witness while testifying; any interest, bias or prejudice the witness may have; any relationship with other witnesses or interested parties; and the reasonableness of the testimony of the witness considered in the light of all of the evidence in the case.
>
> If there are conflicts in the evidence, it is your duty to reconcile the conflicts, if you can, on the theory that each witness has testified to the truth. You should not disregard the testimony of any witness without a reason and without careful consideration. If you find conflicting testimony that you cannot reconcile, you must determine which of the witnesses you believe and which of them you disbelieve.
>
> In weighing the testimony to determine what or whom you believe, you should use your own

knowledge, experience, and common sense gained from day-to-day living.

(R. 3743).

The Stampers' tendered instruction No. 6 was nearly identical to the above instruction, but added the following paragraph, which was refused:

> If you should believe from the testimony in this case that any witness or witnesses has or have willfully testified falsely to any material matters or facts in this case, intending by such false testimony to mislead and deceive as to the truth in the case, you may disregard the whole or any part of the testimony of such witness or witnesses if, in your opinion, you are justified in so doing.

(Supp. R. 4–5).

The Stampers also argue that the trial court erred in giving its final instruction No. 4 because it informed the jury of its "duty to reconcile the conflicts" in the evidence and presume the truthfulness of each witness. The Stampers cannot complain of error, however, because their tendered instruction No. 6 contained this identical language.

We also note that from our review of the record, the Stampers mischaracterize the testimony of Hyundai's expert witnesses in each instance of alleged false testimony. Inconsistencies, if in fact there were any, do not necessarily amount to perjury.

whether a trial court erroneously refused a tendered instruction, we consider (1) whether the tendered instruction correctly states the law, (2) whether there is evidence in the record to support giving the instruction, and (3) whether the substance of the instruction is covered by other instructions. *Cliver v. State*, 666 N.E.2d 59, 66–67 (Ind.1996).

This court has considered a tendered jury instruction similar to the Stampers' previously. In *Rieth–Riley Constr. Co., Inc. v. McCarrell*, 163 Ind.App. 613, 325 N.E.2d 844 (1975), the trial court refused Reith–Riley's *falsus in uno, falsus in omnibus* instruction [8] for the reason that it was adequately covered by the court's given instructions. The *Rieth–Riley* court listed four other instructions "pertaining to credibility of witnesses." *Id.* Instruction No. 2 directed the jury that it was the sole judge of the credibility of the witnesses, that it should attempt to reconcile conflicts in the evidence so as to "believe all of the testimony of all of the witnesses," *id.* at 623, 325 N.E.2d at 851, and that it should determine whom is to be believed and not to be believed. Each of these points was included in the trial court's Instruction No. 6, given to the Stampers' jury.

Instruction No. 5 given by the *Rieth–Riley* trial court reiterated some of the content of the above instruction concerning conflicts in the evidence and instructed the jury on "the theory that each witness has testified to the truth." [9] *Id.* Again, the Stampers' jury was similarly instructed. Instruction No. 11 and 11A given to the *Rieth–Riley* jury directed that inconsistent statements by witnesses may be considered in deciding the weight to

be given to that testimony, or may be considered to be admissions. Likewise, the Stampers' jury was instructed that "if you find conflicting testimony that you cannot reconcile, you must determine which of the witnesses you believe and which of them you disbelieve." (R. 3743).

We conclude that the trial court did not err in refusing the instruction.

## V. Jury Instruction on Duty of Care

The Stampers contend that the trial court erred when it gave Instruction No. 14 to the jury in both trials:

> As to plaintiff's claim that defendants failed to provide a crashworthy vehicle, you are instructed that the defendants are not required to produce an injury-proof vehicle. Rather, defendants are only required to act reasonably to ensure the design does not create an unreasonable danger.

(R. 3755). The Stampers argue that the phrase "only required to act reasonably" improperly injects a negligence standard into a strict liability case and that the first sentence is an improper negative instruction. Indiana's Product Liability Act provides that a party who "sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous" is subject to liability for harm caused by the product. Ind.Code 33–1–1.5–3(a). The Stampers point out that the Act imposes liability even though "the seller has exercised all reasonable care." [10] Ind.Code § 33–1–1.5–3(b)(1).

---

8. The tendered instruction read:

 If you believe that any witness including any party, has willfully and knowingly testified falsely as to any material fact in this case, you may disregard his entire evidence except so far as he is corroborated by other credible evidence or by other equally credible facts and circumstances proved in the trial.

 *Id.* at 622, 325 N.E.2d at 850. The gist of this instruction is the same as that tendered by the Stampers: a witness's testimony may be disbelieved entirely if that witness has intentionally lied on any individual point.

9. The Stampers attempt to distinguish *Rieth–Riley* by asserting that the jury in that case was not told to presume the truthfulness of the witnesses, as does the Indiana Pattern instruction upon

which the Stampers' instruction was based. In fact, the two instructions contain identical language on this point.

10. The Act was amended in 1995 to require that

 in any action based on an alleged design defect in the product or based on a alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller *failed to exercise reasonable care under the circumstances in designing the product* or in providing the warnings or instructions.

 P.L. 278–1995, SEC. 3 (emphasis added).

Hyundai argues that a claim based on the doctrine of crash worthiness is distinct from typical product liability cases in that it is not alleged that the accident itself was caused by any design defect, only that the product failed to provide adequate protection.

 In 1990, our supreme court first recognized the doctrine of crash worthiness, and held that an action for enhanced injury while using a product can lie for resulting damages. *Miller v. Todd,* 551 N.E.2d 1139, 1142 (Ind.1990). The *Miller* court adopted the rule put forth in *Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir.1968), that "a manufacturer has a duty to use reasonable care to design a vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." *Miller,* 551 N.E.2d at 1141.

> The *Larsen* court did not require a manufacturer to construct an accident-proof vehicle; rather, it held that general negligence principles apply to impose liability when unreasonable risk of injury is created by the manufacturer's design. *Larsen* suggests that whether or not the design creates unreasonable danger can be determined using general negligence principles "which involve a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm."

*Miller,* 551 N.E.2d at 1141 (citing *Larsen,* 391 F.2d at 502) (citation omitted). We agree with Judge Easterbrook that "the definition of a product defect in Indiana depends on general principles of negligence," in the context of claims involving crashworthiness. *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 902 (7th Cir.1994).

Neither of the Stampers' briefs discuss the *Miller* case.[11] The Stampers do concede that negligence principles may be involved in determining what constitutes an unreasonably dangerous product, but argue that this determination is distinct from establishing that the defect resulted from the manufacturer's fail-ure to exercise reasonable care. This is a distinction without a difference. If we are to rely upon general principles of negligence to determine whether a product is defective, the supposed negligence can only be that of the manufacturer of the product.

As for the Stampers' argument that the first sentence of Instruction No. 14 is an improper negative instruction, we note that they cite no authority for this proposition.[12] The proposition that a manufacturer is not required to produce an injury- or accident-proof vehicle is amply supported by case law. *See Miller,* 551 N.E.2d at 1141; *Fox v. Ford Motor Co.,* 575 F.2d 774, 783 (10th Cir.1978); *Huddell v. Levin,* 537 F.2d 726, 735 (3rd Cir.1976). We conclude that the trial court did not err in instructing the jury.

Affirmed.

DARDEN and STATON, JJ., concur.

---

11. *Miller* is cited in a footnote for the proposition that the intended use of automobiles includes surviving collisions.

12. The Stampers only citation is Justice Hunter's dissenting opinion in *Conder v. Hull Lift Truck, Inc.,* 435 N.E.2d 10, 19–20 (Ind.1982).