**Jude Joseph PEREZ, M.D., Appellant,**

v.

**James D. BAKEL, individually, and as personal representative of the Estate of Alora Bakel, deceased, Appellee.**

No. 82A01–0604–CV–144.

Court of Appeals of Indiana.

March 6, 2007.

---

Christopher P. O'Bryan (pro hac vice), Tracy S. Prewitt, Mark E. Hammond,

O'Bryan Brown & Toner, PLLC, Louisville, KY, Attorneys for Appellant.

Terry Noffsinger, Noffsinger Law P.C., Evansville, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Jude Perez, M.D., appeals the judgment entered against him on James Bakel's complaint alleging medical malpractice that resulted in the death of his wife, Alora Bakel. We affirm in part and reverse in part.

### Issues

Dr. Perez raises four issues, which we restate as:

I. whether the trial court properly denied Dr. Perez's motion for judgment on the evidence regarding the element of causation;

II. whether the trial court properly denied his request for a new trial based on the closing argument;

III. whether the trial court properly admitted the testimony of Dr. Herbert Rogove; and

IV. whether the trial court properly granted James's request for prejudgment interest.

### Facts[1]

In early April 1999, James and fifty-seven-year-old Alora drove to Florida for a vacation. On the way to Florida, Alora experienced dizziness, pain in her chest, and difficulty breathing. They arrived in Florida on a Friday morning and rested all

1. We remind the parties that Indiana Appellate Rule 46(A)(6) requires that the facts be stated in accordance with the standard of review appropriate to the judgment being appealed and that they shall be in narrative form and not a witness by witness summary of the testimony.

day. The next morning Alora was still experiencing similar symptoms, and the couple decided to go to a local hospital. The emergency room physician ran some tests and called in a cardiologist. The cardiologist suspected blockage in an artery leading from her heart that could lead to a massive heart attack. Alora remained in the hospital until Monday when a heart catheterization revealed that her arteries were not clogged and that she was not in danger of having a heart attack. Alora was released from the hospital and the two continued their vacation for the remainder of the week.

James and Alora drove home, arriving in Evansville on April 10, 1999. Alora had already scheduled an appointment with her doctor for April 19, 1999. After arriving home, Alora continued to experience shortness of breath. On the morning of April 18, 1999, Alora woke up and told James that she needed to go to the emergency room. They arrived at St. Mary's Medical Center at 8:48 a.m. The treating physicians ran tests and obtained Alora's records from the Florida hospital. After monitoring her and reviewing her test results, an appointment was scheduled for first thing the next morning with a cardiologist. Alora was released from the hospital at 12:40 p.m. that day. When they arrived home Alora laid on the couch. Shortly thereafter, Alora told James to call an ambulance. An ambulance transported Alora to another hospital, and she died that afternoon. An autopsy revealed that the cause of death was a pulmonary embolism.

On December 1, 2004, James, personally and on behalf of Alora's estate, filed an amended complaint alleging St. Mary's Medical Center and the emergency room physician, Dr. Perez, were negligent and caused Alora's death. James made an offer to settle his claim against Dr. Perez for $250,000. Apparently, Dr. Perez rejected this offer, and after a trial, a jury found James suffered damages in the amount of $940,540.88. The trial court entered judgment against Dr. Perez for that amount.

Dr. Perez moved to set aside the entry of judgment and for remittitur. Dr. Perez also filed a motion to correct error and a motion for new trial. After a hearing, the trial court reduced the **judgment** to $750,000. The trial court entered a judgment against Dr. Perez in the amount of $100,000, with the remainder to be paid by the Patient's Compensation Fund as required by the Medical Malpractice Act.[2] The trial court denied Dr. Perez's motion to correct error and request for a new trial. James moved for an award of prejudgment interest, which the trial court granted after a hearing as to the $100,000 judgment against Dr. Perez. Dr. Perez now appeals.

## Analysis

### I. Judgment on the Evidence

Dr. Perez argues that the trial court improperly denied his motion for judgment on the evidence regarding the issue of proximate cause. In reviewing a ruling on a motion for judgment on the evidence, we apply the same standard as the trial court. *Smith v. Baxter,* 796 N.E.2d 242, 243 (Ind.2003). Judgment on the evidence is proper only where an issue is not supported by sufficient evidence. *Id.* (citing Ind. Trial Rule 50(A)). We consider only the evidence and reasonable inferences most favorable to the non-moving party. *Id.* A motion should be granted only where there is no substantial evidence

2. At the time of the alleged malpractice in this case, the Medical Malpractice Act capped a health care provider's liability for an occurrence of malpractice at $100,000. This was amended effective July 1, 1999, to increase the cap to $250,000. *See* Ind.Code § 34–18–14–3(b).

supporting an essential issue in the case. *Id.* "If there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper." *Id.*

▮ Generally, "a plaintiff must prove each of the elements of a medical malpractice case, which are that: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries." *Sawlani v. Mills,* 830 N.E.2d 932, 938 (Ind.Ct.App.2005), *trans. denied.* Proximate cause has two aspects. *City of Gary ex rel. King v. Smith & Wesson Corp.,* 801 N.E.2d 1222, 1243 (Ind.2003). The first aspect—causation in fact—is established if the plaintiff can show that the injury would not have occurred without the defendant's negligent act or omission. *Id.* at 1243–44. The second component of proximate cause is the scope of liability, which turns largely on whether the injury is a natural and probable consequence that in the light of the circumstances should have been foreseen or anticipated. *Id.* at 1244. "Under this doctrine, liability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission." *Id.*

Dr. Perez argues that there is insufficient evidence of proximate cause because all of the medical experts agreed that Heparin therapy would not have dissolved the fatal blood clot. "Thus, no action by [Dr. Perez] could have saved [Alora's] live [sic] as the administration of Heparin by [Dr. Perez] would have had no effect on the fatal blood clot that caused [Alora's] death." Appellant's Br. p. 16. Dr. Perez then points to his experts' testimony that Heparin therapy could not have saved Alora's life.

However, as James points out, even if Heparin would not have dissolved the clot, he presented expert testimony that Heparin therapy would have benefited Alora and could have saved her life. For example, Dr. Samuel Kiehl[3] testified that once a pulmonary embolism is highly suspected or diagnosed, it is incumbent on the physician to place the patient in an intensive care setting. He testified that the physician needs to start the patient on "Heparin or a form of Heparin which is a medicine that interrupts clotting." Tr. p. 96. "Heparin will stop the growth of a clot. I[sic] can interrupt the clotting process." *Id.* James's counsel questioned Dr. Kiehl:

Q: And if someone were to say that because she already had clots that the administration of Heparin would not do any good, would you agree with that?

A: I absolutely would not. . . .

* * * * *

Q: If [Alora's] pulmonary embolism was diagnosed by Dr. Perez, do you have an opinion as to whether there was time to save her?

A: I do.

Q: And what is that opinion?

A: I believe she would have lived.

*Id.* at 105–113. Dr. Kiehl was later questioned:

Q: Over time after the administration of Heparin and Coumadin what can happen?

---

**3.** In his reply brief, Dr. Perez argues that James "cites to no other testimony" than that of Dr. Rogove and that he "relies solely upon" Dr. Rogove's testimony to show that Dr. Perez's motion for judgment on the evidence was properly denied. Appellee's Reply Br. pp. 3, 4. To the contrary, however, on page 13 of his Appellee's Brief, James specifically cites Dr. Kiehl's trial testimony.

A: Well, it depends on how established they are in the legs. Those clots often just stay there unless I give external thombolysis. The newer end of that often will resolve. The older end of it often just remains there.

Q: It's the newer clots that are the risk. Is that correct?

A: Well, new obviously is a relative term. One of the problems that can happen is a new clot forms on a relatively new old clot then that clot, the entirety of the clot, can be destabilized. If I have a weight hanging on the end of this established clot that is getting beaten on by this blood flow going by, it's possible that that established clot can be dislodged and the whole kit and caboodle can go up toward the heart which is what I think happened here.

Q: But the administration of Heparin, how soon can it affect the break off of these clots?

A: Well, as far as formation of any new clot essentially within minutes that new clotting is stopped. It's just dead in its tracks....

*Id.* at 191–192. Dr. Kiehl also testified:

Q: ... was there still time and opportunity to a reasonable degree of medical certainty to save [Alora's] life by administering Heparin in Evansville at the time that you said it should have been administered?

A: What I would say is that there was an opportunity to save her life had things been done properly including Heparin.

Q: And that goes back starting with the testing and then treating; correct?

A: It involves making a diagnosis and then administering proper treatment which would include intensive care and Heparin treatment.

*Id.* at 202.

Dr. Kiehl stated that Alora "had a greater than fifty percent chance" of survival had she received Heparin. *Id.* at 129. He stated that if Alora had been in the intensive care unit she would have been at rest and "less likely to throw a pulmonary embolus." *Id.* at 113. He also stated that Heparin would have "been reducing the size of the growing embolus" and that he "could have done rescue measures hopefully before she had a cardiac arrest." *Id.* at 114. Dr. Kiehl testified that even though the Florida doctors did not do what they should have, there was time to save Alora in Evansville. *See Id.* at 190.

Despite Dr. Kiehl's extensive testimony, Dr. Perez argues, "Kiehl has agreed in fact that the administration of Heparin by [Dr. Perez] could not have prevented [Alora's] death." Appellee's Reply Br. p. 4. This conclusion simply cannot be drawn from a complete reading of Dr. Kiehl's testimony. Even if Heparin would not have immediately and completely dissolved the existing clot, Dr. Kiehl's testimony shows that Heparin treatment would have provided other benefits to Alora. Dr. Kiehl's testimony alone establishes Dr. Perez's discharge of Alora without administering Heparin was a proximate cause of Alora's death. This evidence would allow reasonable people to differ as to the result, rendering judgment on the evidence improper. *See Smith,* 796 N.E.2d at 243. The trial court properly denied Dr. Perez's motion for judgment on the evidence and left the question of causation to the jury.

## II. Closing Argument

■ Dr. Perez argues that he was unfairly prejudiced by James's counsel's closing argument. He contends that the closing argument inaccurately portrayed

James as being alone in the world even though he had remarried since Alora's death. Dr. Perez concedes that he did not did not object to this line of argument during trial, but argues that the error was so egregious that an objection was not necessary. Dr. Perez likens the closing argument to the fundamental error doctrine used in criminal cases.

 It is well-settled that to preserve a ruling with regard to remarks by opposing counsel, a specific objection and a request that the jury be admonished to disregard the remarks are required. *Stamper v. Hyundai Motor Co.*, 699 N.E.2d 678, 682 (Ind.Ct.App.1998), *trans. denied.* Even if, as Dr. Perez argues, an admonishment would not have cured the problem, we will reverse a judgment due to allegedly improper remarks by counsel during argument only when it appears from the entire record that the remarks, in all probability, formed the basis for securing an incorrect verdict. *Id.*

First, at the hearing on Dr. Perez's motion to correct error and request for a new trial, the trial court specifically stated that had Dr. Perez objected, it would have told James's counsel, outside of the presence of the jury, to stop that line of argument, minimizing the impact on the jury. More importantly, however, the trial court stated that although the argument may have crossed the line, it did not affect the jury's verdict. Because the line of argument did not affect the jury's verdict, Dr. Perez has not established that a new trial is required.

### III. Admission of Dr. Rogove's Testimony

 Dr. Perez argues that the admission of Dr. Rogove's videotaped testimony was beyond the scope of that permitted by the trial court when, in a pretrial ruling, it allowed James to belatedly include Dr. Rogove as an expert witness. Dr. Perez argues that "[o]bjection to the introduction of his testimony was overruled by the trial court and the jury was permitted to hear his testimony in full during the trial." Appellant's Br. p. 22. Dr. Perez provides no citations to this objection or the trial court's ruling on it. Our review of the transcript immediately prior to admission of Dr. Rogove's testimony shows that Dr. Perez made no such objection.

 Generally, a party must object to evidence at the time it is offered into the record. *Everage v. Northern Indiana Pub. Serv. Co.*, 825 N.E.2d 941, 948 (Ind. Ct.App.2005). The failure to timely object waives the right to have the evidence excluded at trial and the right on appeal to assert the admission of evidence as erroneous. *Id.* By failing to timely object, the party is, in effect, acquiescing in the admission of the evidence. *Id.* Because it does not appear that Dr. Perez objected at trial prior to the admission of Dr. Rogove's testimony, this issue is waived.

 To the extent that Dr. Perez may be referring to his motion in limine in which he sought the exclusion of Dr. Rogove's testimony as an "objection," the filing of a motion in limine alone does not preserve the issue for appeal. The chronological case summary ("CCS") indicates that on the Friday before the trial began, the trial court held a hearing on Dr. Perez's motion in limine and that it took Dr. Perez's motion under advisement. Although Dr. Perez included his motion in his appendix, he did not provide us with any citation or reference to the trial court's ruling on this motion. Nevertheless, even if we assume that his motion in limine was denied, it is well-settled that in order to preserve error in the denial of a pre-trial motion in limine, the appealing party must object to the admission of the evidence at the time it is offered. *Wein-*

*berg v. Geary,* 686 N.E.2d 1298, 1300 (Ind. Ct.App.1997), *trans. denied.* "Failure to object at trial to the admission of the evidence results in waiver of the error." *Id.* Thus, in the absence of a contemporaneous objection to Dr. Rogove's testimony at trial, this issue is waived.[4]

### IV. Prejudgment Interest

██ Dr. Perez argues that the trial court improperly awarded James prejudgment interest on the $100,000 judgment entered against him.[5] A trial court is permitted to award prejudgment interest as part of a judgment for any civil action arising out of tortious conduct. Ind.Code §§ 34–51–4–1, 34–51–4–7. However, this chapter does not apply if "the amount of the offer exceeds one and one-third (1 1/3) of the amount of the judgment awarded."[6] I.C. § 34–51–4–6(3).

James offered to settle the case against Dr. Perez and/or St. Mary's Medical Center for $250,000. Dr. Perez argues that because the judgment against him was capped at $100,000, James's offer exceeded $133,000—the maximum permitted by the prejudgment interest statute. James responds that his offer to settle for $250,000 should be compared to the $940,540.88 jury verdict, not the $100,000 judgment that was eventually entered against Dr. Perez based on the Medical Malpractice Act's cap. He contends that the purpose of permitting awards of prejudgment interest is to encourage settlement and to compensate plaintiffs for the lost time value of money.

Our supreme court has addressed the interplay between the Prejudgment Interest Act and the Medical Malpractice Act. *Cahoon v. Cummings,* 734 N.E.2d 535, 547 (Ind.2000). The court acknowledged that although Indiana Code Section 34–51–4–2 specifically precludes an award of prejudgment interest against the Patient's Com-

---

**4.** As to the merits of this argument, the parties focus on the scope of James's pre-trial belated request to add Dr. Rogove as an expert witness. Dr. Perez claims that Dr. Rogove testified beyond the scope of that which was approved by the trial court. In support of this argument, Dr. Perez contends, "Appellant's counsel specifically recalls the Court granting [James] additional time to disclose Rogove as an expert only for purposes of causation." Appellant's Reply Br. p. 11. Dr. Perez fails to provide any support for this recollection, and such is not consistent with James's written motion. In the absence of an order from the trial court confirming such limitation, we cannot and should not reverse based solely on counsel's recollection of the trial court's ruling.

**5.** Although Dr. Perez provides us with the James's motion for prejudgment interest and his response, he does not include the trial court's order granting James's motion as required by Indiana Appellate Rule 50(A)(2)(a). The CCS provides in part "Over Deft's objection, the court finds that pursuant to IC 34–51–4–6, the pltf is entitled to pre-judgment interest on the sum of $100,000 beginning

10/20/04 at the rate of 6 percent per annum. Pltf presented information that 15 months after the cause of action accrued was on 7/18/00; 180 days after the panel convened was on 3/28/00; and 6 months after the claim was filed in court was 10/24/04. Deft submitted evidence that the prime rate in effect in October of 2004 was between 4.75 and 5 percent." App. p. 2.

**6.** In *Cahoon* our supreme court reworded this requirement as prohibiting an award of prejudgment interest where "the plaintiff ha[s] made a written offer ... to settle for an amount that turns out to be more than seventy-five percent of the judgment ultimately awarded." *Cahoon v. Cummings,* 734 N.E.2d 535, 546 (Ind.2000). The court noted that this formula "is hopefully a more easily understood description of the statute's mathematically equivalent disqualification of a plaintiff whose 'offer exceeds one and one-third (1 1/3) of the amount of the judgment awarded.'" *Id.* at 546 n. 9 (quoting I.C. § 34–51–4–6(3)). Because this language appears to be dicta and the statutory formula is easier to apply under these facts, we use that formula as the basis for our discussion.

pensation Fund, there is no comparable provision immunizing health care providers from prejudgment interest. *Id.* The court addressed whether the Medical Malpractice Act cap operates to limit the health care provider's exposure to all items, including prejudgment interest and observed that it had previously held, " 'a qualified health care provider is responsible for the payment of the collateral litigation expense of pre-judgment interest' even if that brings the provider's total liability over the cap." *Id.* (quoting litigation *Emergency Physicians of Indianapolis v. Pettit,* 718 N.E.2d 753, 757 (Ind.1999)). The *Cahoon* court concluded, "However, each judgment debtor is responsible only for the interest 'attributable to [the provider's] individual liability,' i.e., interest on $100,000." *Id.* (quoting *Pettit,* 718 N.E.2d at 757) (alteration in original). The *Cahoon* court also observed:

> Accordingly, we have held that prejudgment interest is recoverable from a health care provider on the amount of the judgment against that provider. Because that judgment amount is subject to the statutory cap, and prejudgment interest is not available from the fund, this will not provide the plaintiff with full relief, but it is the balance we conclude the legislature has struck between the competing interests of fairness and encouragement to settle reflected in the prejudgment interest statute and the Medical Malpractice Act's concern for health care cost containment.

*Id.* at 547–48.

Generally, a jury returns a verdict, and then the trial court enters a judgment in a separate document. *See* T.R. 58(A). Because the statute says "judgment," we must decline James's request to compare the settlement offer to the jury's verdict. *See* I.C. § 34–51–4–6(3). Further, as discussed in *Cahoon,* the legislature has struck a balance between the purposes behind the Prejudgment Interest Act and the Medical Malpractice Act. Accordingly, we also reject the policy arguments urged by James. Here, the amount of the revised judgment entered against Dr. Perez was $100,000, not $940,540.88. $100,000 is the relevant number to compare to the settlement offer for purposes of the Prejudgment Interest Act. That is the full amount for which Dr. Perez personally is or ever could have been liable to James under the Medical Malpractice Act. James's settlement offer of $250,000 was more than one and one-third of the judgment entered against Dr. Perez.[7]

Furthermore, we believe the language of the settlement offer is clear that Dr. Perez was being asked to pay $250,000 to settle this case, with or without any contribution from St. Mary's Medical Center. It was appropriate for Dr. Perez to reject such a settlement offer asking him to pay more than was permitted at the time by the Medical Malpractice Act and the language of the Prejudgment Interest Act should not be read as requiring Dr. Perez to pay prejudgment interest because of that rejection. The trial court improperly awarded James prejudgment interest.

### Conclusion

The trial court properly denied Dr. Perez's request for judgment on the evidence. Dr. Perez's failure to timely object waives his arguments regarding James's closing argument and the admission of Dr. Rogove's trial testimony. However, because James's $250,000 settlement offer exceed-

---

**7.** As noted earlier, the Medical Malpractice Act was amended shortly after the events of this case to provide for a per provider/per occurrence cap of $250,000. Regardless, the relevant cap in this case is $100,000 and the settlement offer greatly exceeded that amount.

ed the statutory limit, the trial court improperly awarded him prejudgment interest and we reverse that part of the trial court's order.

We affirm in part and reverse in part.

SULLIVAN, J., and ROBB, J., concur.