**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Aug 27 2012, 9:12 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**J. ZACH WINSETT**
**J. BURLEY SCALES**
Scales and Winsett, LLP
Boonville, Indiana

ATTORNEYS FOR APPELLEE
FIFTH THIRD BANCORP:

**MARC D. FINE**
**KYLE R. RUDOLPH**
Rudolph, Fine, Porter & Johnson, LLP
Evansville, Indiana

ATTORNEY FOR APPELLEE
GUIDO JOIKO:

**B. MICHAEL MACER**
Biesecker Dutkanych & Macer, LLP
Evansville, Indiana

ATTORNEY FOR APPELLEE
GERALYN BRADLEY:

**MARK MILLER**
Bowers Harrison, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF GUIDO JOIKO, | ) ) ) | |
| KENNETH SCHAAF, | ) ) | |
| Appellant, | ) ) | |
| vs. | ) ) | No. 87A04-1112-GU-705 |
| FIFTH THIRD BANCORP, GUIDO JOIKO, and GERALYN BRADLEY, | ) ) ) | |
| Appellees. | ) | |

**August 27, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHEPARD, Senior Judge**

Guido Joiko, who is about eighty years old, recently created a new living trust for his substantial assets. Appellant Kenneth Schaaf was Joiko's long-term accountant and also a beneficiary under an earlier trust. Schaaf contends that Joiko could not execute the new trust because he was under guardianship and, alternatively, that there was insufficient evidence that Joiko was of sound mind at the time of execution. We affirm.

FACTS AND PROCEDURAL HISTORY

Born in 1930, Joiko moved from Germany to the United States in 1971. He has never been married and has no children. His only living relative is his sister-in-law Anna Joiko, who lives in Germany. His assets are valued at two million dollars.

Joiko executed a revocable living trust in 2002. After a 2006 amendment, the trust provided that upon Joiko's death the assets would be converted to cash and distributed in equal parts to Anna Joiko, Schaaf, Mike Krantz, and Mark Krantz.

At some point, Joiko renewed a friendship with Geralyn Bradley, whom he had known thirty years earlier. Joiko began staying with Bradley in May 2007, and she helped care for him.

2

Early in that same month, Mark Krantz filed a petition in the Warrick Superior Court alleging that Joiko was unable to care for his person and financial affairs and requesting that Schaaf be appointed as guardian of Joiko's person and estate. He attached a letter from Joiko's primary care physician, Dr. Kent McKinney, stating that Joiko had had progressive memory dysfunction since 2003 and that his ability to function had been significantly impaired, especially since 2005. The trial court found Joiko incapacitated and appointed Schaaf as temporary guardian of his person and estate.

A couple of weeks later, Joiko objected to the appointment and petitioned the court to terminate the guardianship. The parties eventually agreed that Joiko was incapacitated as a result of his medical condition, and they jointly proposed that Schaaf remain guardian of Joiko's estate and Bradley become guardian of his person. The court accepted the parties' agreement in June 2008.

In May 2009, Joiko asked the court to remove Schaaf. He asserted that Schaaf failed to encourage his independence, disregarded his wishes, and refused to provide him with information about his finances. He also claimed that Schaaf was acting out of self-interest as an eventual beneficiary of the trust. Schaaf responded that he was in compliance with the guardianship laws and that his repeated attempts to contact Joiko about his estate had been unsuccessful.

The court conducted a hearing, and in April 2010 it found no malfeasance by Schaaf. On the other hand, it also found that Joiko's distrust and hostile feelings toward Schaaf were influenced by Bradley and, warranted or not, caused Joiko extreme stress. It therefore substituted Fifth Third Bancorp as guardian of the estate.

3

In November 2010, Fifth Third filed a petition for instruction. It sought approval for renovations of Joiko's home and restoration of his antiques and furniture. It also asked to transfer Joiko's assets to a revocable living trust created on October 15, 2010 ("2010 Trust"), for which Fifth Third was trustee. The new trust provided that upon Joiko's death all tangible property would go to Bradley, with ninety percent of the remainder to her and ten percent to Anna Joiko.

Schaaf moved to intervene, alleging that Joiko did not have the legal capacity to execute the 2010 Trust. The court allowed intervention over Joiko's objection.

At a hearing in November 2011, Joiko presented evidence from health care professionals he had seen in the past few years as follows:

In July 2007, Joiko saw clinical psychologist Larry Archer for a neurobehavioral evaluation. Archer's report noted that Joiko had severe impairment in several areas, but it also concluded that he had average to above average intellectual functioning. Archer's diagnostic impressions included vascular dementia and dementia of the Alzheimer's type, late onset, uncomplicated. While Joiko would have difficulty with complex matters, said the psychologist, he was capable of handling day-to-day financial transactions.

During a visit with Dr. McKinney in August 2007, Joiko became involved in an altercation with a staff member and ended up in the emergency room for evaluation. This led to a psychiatric examination by Dr. Gene Flick. Dr. Flick's report noted that Joiko was cooperative and polite and that there was no evidence of anger or being out of control. He said there was "evidence of some very early mild dementia but not so much as to endanger the patient's competency." Ex. 7, p. 3. As for the guardianship situation,

4

Dr. Flick said, "[I]t is not clear to me exactly who is in charge of the patient's affairs although at this point I am not convinced that anyone need be." *Id.* at 6. He concluded that Joiko was competent to manage his own affairs. Dr. Flick was "comfortable in clearing the patient for discharge from a psychiatry standpoint." *Id.*

Joiko began seeing Dr. John Honningford as his primary care physician in June 2007 and continued to see him for two years. Dr. Honningford said in a deposition that he saw no decrease in Joiko's mental functioning and in fact believed it had increased a small amount due to his reduced alcohol consumption. While Bradley accompanied Joiko at each visit, Dr. Honningford was fluent in German and often conversed with Joiko in German, which Bradley did not speak. Joiko told Dr. Honningford that he felt that he was being victimized and left out of the decision-making process regarding his finances. From their conversations, Dr. Honningford was satisfied that such complaints were his own and not Bradley's. Honningford saw no reason why Joiko should be excluded from making his own financial decisions.

In November 2009, Joiko saw Honningford's partner Dr. David Schultz, who became Joiko's primary care physician when Dr. Honningford left the practice. Dr. Schultz also saw Joiko in June, July, and October 2010 and evaluated his mental status at each visit. Joiko responded to questions appropriately, made good eye contact, and did not rely on others for answers to questions posed. Although Joiko had mild dementia, Dr. Schultz found his mental status to be appropriate.

The October medical visit occurred just two days before Joiko executed the 2010 Trust, and Dr. Schultz concluded then that he was of sound mind and body and able to

5

make his own decisions.  He submitted a report stating that Joiko "possesse[d] adequate mental capacity to comprehend property, bounty, and estate decisions."  Ex. 4, p. 1.  Dr. Schultz later testified that Joiko knew who his friends and relatives were and could appreciate how they had treated him.  He had continued to see Joiko since the October 2010 visit and saw "no overall significant change in his cognitive function."  Tr. p. 42.

Asked about a Mini Mental Status Exam, Schultz testified that he did not perform that particular test on Joiko at the October 2010 appointment because he questioned the reliability of the test:

> I did not use that Mini Mental Status Exam because there have been a lot of questions raised [as] to its efficacy and even validity in ascertaining a person's cognitive and mental function.  The concerns being that sometimes it over estimates and under estimates the person's true cognitive abilities.  Furthermore, there's not a lot of good data to suggest its use is very sensitive in the treatment of dementia.

*Id.* at 43.

Joiko also called to the stand the representatives from Fifth Third who assisted him with the 2010 Trust.  Trust officer Desiree Eddington testified that Joiko met with her three or four times before Fifth Third's appointment as guardian of the estate and eighty to a hundred times since the appointment, including semi-annual meetings to specifically review his investments.  She said that Joiko knew he was a millionaire, tracked his investments, and enjoyed knowing how much each of his bonds made.  As to estate planning, Joiko was clear and consistent about what he wanted to do with his property and was never confused or disoriented.  Eddington went through the trust document with Joiko in August, September, and October 2010.  She was satisfied that he

6

understood all of its provisions. Because Eddington was unable to attend the signing of the trust document, trust officer Jamie Wicks went in her place. Wicks did not go through the trust document with Joiko but believed that he understood its purpose.

Schaaf presented only one witness at this November 2011 hearing, Dr. Henry Davis, the emergency room doctor who referred Joiko to Dr. Flick for a psychiatric evaluation in 2007. Dr. Davis testified that he would have administered the Mini Mental Status Exam if he were asked to evaluate a patient's competency. Based on the record he had reviewed, which included the determinations of Archer, Dr. Flick, and Dr. Schultz, Dr. Davis testified that he could not make a determination of Joiko's mental status on the day Joiko executed the new trust in October 2010.

At the conclusion of the hearing, the trial court found "overwhelming" evidence that Joiko had the capacity to execute the 2010 Trust. *Id.* at 216. It therefore authorized Fifth Third to transfer Joiko's assets into the trust. Schaaf now appeals.

## DISCUSSION AND DECISION

### I. WHETHER A WARD MAY EXECUTE A TRUST

Schaaf first contends that Joiko lacked the mental and legal capacity to execute the 2010 Trust because he was determined incapacitated in the course of the guardianship proceeding.

The Code says: "The capacity of a settlor that is required to create, amend, revoke, or add property to a revocable trust is the same as the capacity of a testator that is required to make a will." Ind. Code § 30-4-2-10(b) (2006). To make a will, a person must be of "sound mind." Ind. Code Ann. § 29-1-5-1 (West 2010).

7

An incapacitated person for purposes of guardianship includes someone who is unable to manage in whole or in part his property or to provide self-care or both because of a mental deficiency. Ind. Code § 29-3-1-7.5(2) (1992). Generally, a court must appoint a guardian if it finds that the individual in question is an incapacitated person and the appointment of a guardian is necessary to provide care and supervision of that individual's person or property. Ind. Code § 29-3-5-3(a) (1989).

Schaaf's argument is largely that by definition a person incapacitated under guardianship law does not possess the sound mind required to execute a will or trust. The Indiana Supreme Court rejected this notion over a hundred years ago: "The adjudication of mental unsoundness in proceedings for the appointment of a guardian for a person, while it conclusively establishes the fact of his inability to manage his estate, does not necessarily establish the existence of such unsoundness as would incapacitate him from making a valid will." *Harrison v. Bishop*, 131 Ind. 161, 30 N.E. 1069, 1071 (1892). This is still the rule, as the Court recently declared: "[I]t is well established that a guardianship does not preclude a ward from executing a will." *Estate of Prickett v. Womersley*, 905 N.E.2d 1008, 1010 (Ind. 2009). We therefore conclude that Joiko was not barred from executing the 2010 Trust merely because he was under guardianship.[1]

---

[1] Schaaf also contends that the 2010 Trust must be revoked because it gives Joiko the power to transfer his property into the trust at any time and because it materially changes his prior testamentary wishes. We decline to address these issues because they were not before the trial court. The only issue before the court was whether Joiko had the capacity to execute the 2010 Trust. *See* Appellant's App. pp. 13, 143 (court allowing Schaaf to intervene solely on the question of Joiko's "legal and mental ability to execute" the 2010 Trust).

## II. SUFFICIENCY OF THE EVIDENCE

Schaaf next contends that the evidence is insufficient to show that Joiko was of sound mind when he executed the 2010 Trust.

When reviewing the sufficiency of the evidence in a civil case, we determine whether there is substantial evidence of probative value supporting the judgment. *Bd. of Works of Lake Station v. I.A.E., Inc.*, 956 N.E.2d 86, 92 (Ind. Ct. App. 2011), *trans. denied*. We neither reweigh the evidence nor judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Id.*

Every person is presumed to be of sound mind to execute a will until the contrary is shown. *Hays v. Harmon*, 809 N.E.2d 460, 464 (Ind. Ct. App. 2004), *trans. denied*. Here, Joiko executed the 2010 Trust after the court determined he was incapacitated as a result of his medical condition and placed him under guardianship. While the guardianship determination is certainly prima facie evidence of unsound mind, a party seeking to uphold the execution of a trust may do so by carrying the burden to show that the ward had the requisite mental capacity at the time of execution. *See Harrison*, 30 N.E. at 1071. Put another way, the 2010 Trust may be confirmed upon a showing that Joiko had the capacity to know: (1) the extent and value of his property; (2) those who are the natural objects of his bounty; and (3) their deserts, with respect to their treatment of and conduct toward him. *See Hays*, 809 N.E.2d at 464-65.

The evidence at the hearing demonstrated just that. The testimony from primary care physicians, a psychiatrist, a psychologist, and various bank representatives with

direct contract, recited above, all pointed in the same direction. Dr. Schultz, to name but one in particular, saw Joiko two days before the 2010 Trust was executed and concluded that he had the capacity "to comprehend property, bounty, and estate decisions."[2] Ex. 4, p. 1. Dr. Schultz believed that although Joiko had mild dementia, he was of sound mind and body and able to make his own decisions.

As against this substantial evidence, Schaaf points to the testimony of Dr. Davis, who had not seen Joiko in more than four years, regarding the necessity of administering the Mini Mental Status Exam to evaluate Joiko's competency. It was Dr. Schultz's view, however, that the test was of doubtful reliability. The trial court was entitled to decide which physician to credit on this point. Schaaf also points to Dr. Davis's conclusion that he could not determine Joiko's mental status at the time of the trust execution based on the reports of Archer, Dr. Flick, and Dr. Schultz. We decline his invitation to reweigh the evidence.

In short, we agree with the trial court that there was more than ample evidence that Joiko was of sound mind when he executed the 2010 Trust.

## CONCLUSION

For the reasons stated, we affirm.

---

[2] Schaaf contends the court abused its discretion by admitting Dr. Schultz's expert testimony. Because the record does not show he ever objected to Dr. Schultz's opinions on the basis of his qualifications as an expert, this contention has not been preserved for appeal. *See Perez v. Bakel*, 862 N.E.2d 289, 295-96 (Ind. Ct. App. 2007) (challenge to admission of doctor's testimony waived where appellant failed to object at trial). Schaaf attempts to revive the issue by claiming fundamental error, but fundamental error is generally unavailable in civil matters. *See United Farm Bureau Family Life Ins. Co. v. Fultz*, 176 Ind. App. 217, 375 N.E.2d 601, 611 (1978) ("Fundamental or plain error results only where a statement is made or an act is done which results in prejudicial error that goes to the very heart of a party's case and where that statement or act is wholly outside of the preventive or corrective powers of that party.").

10

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.